**REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

REPEAT CONSULTANTS
INTERNATIONAL, LLC,

     *Plaintiff,*

    v.

THE UNITED STATES,

     *Defendant.*

Case No.: 24-619

Judge Kathryn C. Davis

██████████████████████

## PLAINTIFF'S MOTION FOR
## JUDGMENT ON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") and this Court's Scheduling Order (ECF No. 10), Plaintiff Repeat Consultants International, LLC ("RCI"), by undersigned counsel, and for the reasons set forth in the attached Memorandum, respectfully moves this Court to grant judgment on the administrative record in RCI's favor.  RCI further seeks declaratory and permanent injunctive relief.

Dated: May 24, 2024

*Of Counsel*

David B. Robbins
Noah B. Bleicher
Nathaniel E. Castellano
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

Respectfully submitted,

  /s/ *Moshe B. Broder*
Moshe B. Broder (Counsel of Record)
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
(202) 637-6334
mbroder@jenner.com

*Counsel to Repeat Consultants International, LLC*

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

REPEAT CONSULTANTS
INTERNATIONAL, LLC,

        *Plaintiff,*

   v.

THE UNITED STATES,

        *Defendant.*

Case No.: 24-619
Judge Kathryn C. Davis

███████████████████

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Dated: May 24, 2024

*Of Counsel*

David B. Robbins
Noah B. Bleicher
Nathaniel E. Castellano
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

Respectfully submitted,

/s/ *Moshe B. Broder*
Moshe B. Broder (Counsel of Record)
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
(202) 637-6334
mbroder@jenner.com

*Counsel to Repeat Consultants International, LLC*

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................... 1

II.     ISSUES PRESENTED .............................................................................. 4

III.    RELEVANT FACTUAL BACKGROUND .............................................. 4

    A.    The Solicitation ............................................................................... 4

    B.    Evaluation Criteria .......................................................................... 6

        1.    Technical Capability ............................................................ 6

        2.    Past Performance .................................................................. 7

        3.    Price .................................................................................... 7

    C.    Proposal Submissions ...................................................................... 8

    D.    Evaluation, Source Selection, and Award ....................................... 9

    E.    RCI Notices, Government Accountability Office ("GAO") Protests and
       Corrective Action ........................................................................... 10

IV.     STANDARD OF REVIEW ..................................................................... 15

V.      ARGUMENT ........................................................................................... 16

    A.    The Shanica and Hawax Proposals Contain Material Misrepresentations. .......... 16

        1.    Legal Standard ................................................................... 16

        2.    The administrative record confirms that the Shanica and Hawax proposals
            contain material misrepresentations......................................... 17

        3.    To the extent necessary, remand or limited discovery are warranted to
            determine whether the proposals contain material misrepresentations..... 20

    B.    The Hawax and Shanica proposals are technically deficient; DLA
       improperly relaxed a material Solicitation requirement by selecting those
       proposals for award............................................................................ 22

    C.    DLA's Price Realism Analysis Was Irrational ...................................... 24

        1.    Legal Standard ................................................................... 24

        2.    DLA's use of a price comparison methodology was irrational. .............. 25

i

3.    DLA's realism analysis unreasonably included large government-mandated plug numbers and failed to reasonably assess contractor-proposed differentials................................................................ 29

4.    The Agency's comparison of average prices was a meaningless metric and relied on incorrect computations............................................... 32

D.    The Agency's Corrective Action Investigation Was Arbitrary, Capricious, And Otherwise Contrary to Law. .................................................................34

1.    The contracting officer irrationally failed to meaningfully consider credible evidence of improprieties by Shanica and Hawax. ..................... 35

2.    The contracting officer irrationally performed an inadequate and perfunctory investigation. ............................................................ 37

3.    The Agency should have conducted further investigation beyond simply asking the Awardees to confirm that their proposal representations were not false. ......................................................................... 40

E.    The Contracting Officer's Responsibility Determinations for Shanica and Hawax Are Arbitrary, Capricious, and Otherwise Contrary to Law. ....................42

1.    The contracting officer misapplied the governing standard regarding responsibility determinations. ................................................... 44

2.    The contracting officer failed to follow additional responsibility requirements. .................................................................... 44

3.    The contracting officer arbitrarily failed to further investigate Shanica and Hawax's suspect confirmations. ............................................. 46

VI.    PREJUDICE ............................................................................. 46

VII.    REMEDY ................................................................................ 47

VIII.    CONCLUSION ........................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Active Network, LLC v. United States,*
    130 Fed. Cl. 421 (2017) .......................................................................................29, 30, 32

*Alabama Aircraft Indus., Inc.–Birmingham v. United States,*
    586 F.3d 1372 (Fed. Cir. 2009)........................................................................................16, 35

*Alaska Structures, Inc. v. United States,*
    144 Fed. Cl. 80 (2019) .................................................................................................17, 47, 49

*Algese 2 S.c.a.r.l. v. United States,*
    125 Fed. Cl. 431 (2016) ...................................................................................................18

*Allied Tech. Grp., Inc. v. United States,*
    649 F.3d 1320 (Fed. Cir. 2011)........................................................................................23

*Banknote Corp. of Am., Inc. v. United States,*
    365 F.3d 1345 (Fed. Cir. 2004)...............................................................................15, 35, 42

*Bannum, Inc. v. United States,*
    404 F.3d 1346 (Fed. Cir. 2005)........................................................................................15, 16

*Bender Shipbuilding & Repair Co. v. United States,*
    297 F.3d 1358 (Fed. Cir. 2002)........................................................................................43

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.,*
    972 F.3d 83 (D.C. Cir. 2020).............................................................................................48

*Centech Grp., Inc. v. United States,*
    554 F.3d 1029 (Fed. Cir. 2009).......................................................................................16, 49

*Centerra Grp., LLC v. United States,*
    138 Fed. Cl. 407 (2018) ...................................................................................................15

*Connected Glob. Sols., LLC v. United States,*
    162 Fed. Cl. 720 (2022) ...................................................................................................17

*Connected Glob. Sols. v. United States,*
    159 Fed. Cl. (2022) ...........................................................................................................22

*DigiFlight, Inc. v. United States,*
    165 Fed. Cl. 588 (2023) ............................................................................................. *passim*

*Distributed Sols., Inc. v. United States*,
106 Fed. Cl. 1 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013) ....................................17, 33

*Glob. K9 Prot. Grp., LLC v. United States*,
169 Fed. Cl. 116 (2023) ...........................................................................................20, 21

*Golden IT, LLC v. United States*,
157 Fed Cl. 680 (2022) .................................................................................... *passim*

*IAP Worldwide Servs., Inc. v. United States*,
160 Fed. Cl. 57 (2022) .........................................................................21, 47, 48, 49

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001).....................................................................16, 44

*Klein v. Peterson*,
866 F.2d 412 (Fed. Cir. 1989)..............................................................................20

*Labatt Food Serv., Inc. v. United States*,
577 F.3d 1375 (Fed. Cir. 2009)..............................................................................16

*Mark Dunning Indus., Inc. v. United States*,
142 Fed. Cl. 734 (2019), *aff'd*, 826 F. App'x 925 (Fed. Cir. 2020) ......................44

*McDonnell Douglas Corp. v. U.S. Dept. of the Air Force*,
375 F.3d 1182 (D.C. Cir. 2004).............................................................................35

*Medline Indus., Inc v. United States*,
155 Fed. Cl. 522 (2021) ......................................................................................49

*Mortg. Contracting Servs., LLC v. United States*,
153 Fed. Cl. 89 (2021) .........................................................................................23

*Oak Grove Techs., LLC v. United States*,
155 Fed. Cl. 84 (2021) ..........................................................................20, 35, 41, 42

*Orion Int'l Tech. v. United States*,
60 Fed. Cl. 338 (2004) .........................................................................................22

*Plan. Rsch. Corp. v. United States*,
971 F.2d 736 (Fed. Cir. 1992)...............................................................................17

*Safeguard Base Operations, LLC v. United States*,
989 F.3d 1326 (Fed. Cir. 2021).............................................................................16

*Samsara Inc. v. United States*,
169 Fed. Cl. 311 (2024) .......................................................................................50

*Seventh Dimension, LLC v. United States*,
    160 Fed. Cl. 1 ...................................................................................................49, 50

*Tinton Falls Lodging Realty, LLC v. United States*,
    800 F.3d 1353 (Fed. Cir. 2015).........................................................................47, 48

*Turner Constr. Co., v. United States*,
    645 F.3d 1377 (Fed. Cir. 2011).................................................................................48

*WaveLink, Inc. v. United States*,
    154 Fed. Cl. 245 (2021) ........................................................................24, 25, 47

*WellPoint Mil. Care Corp. v. United States*,
    953 F.3d 1373 (Fed. Cir. 2020)................................................................................16

**Statutes**

28 U.S.C. § 1491 ..........................................................................................................15

28 U.S.C. § 1491(a)(2)..................................................................................................21

28 U.S.C. § 1491(b)(2) .................................................................................................48

Administrative Procedure Act.......................................................................................15

Iran Sanctions Act of 1996, Pub. L. No. 114-277..........................................................1

**Other Authorities**

48 C.F.R. § 9.103(a)......................................................................................................43

48 C.F.R. § 9.103(b) .................................................................................................44, 45

48 C.F.R. § 52.203-2.....................................................................................................46

FAR 9.104–1..................................................................................................................45

FAR 9.104–1(b).............................................................................................................45

FAR 9.104–1(c) ............................................................................................................46

FAR 9.104–1(f).............................................................................................................45

LICENSE, *Black's Law Dictionary* (11th ed. 2019) ....................................................19

v

## I.    INTRODUCTION

RCI challenges the Department of Defense ("DoD"), Defense Logistics Agency—Energy's ("DLA" or "Agency"), violations of law and arbitrary actions in connection with DLA's award of contracts to Shanica Company for Logistics, Mine Action, Importation of Explosive ("Shanica") and Hawax Corporation ("Hawax") for fuel delivery services in Syria and Iraq, respectively, pursuant to Request for Proposals No. SPE605-23-R-0209 ("Solicitation" or "RFP").

This DLA procurement is for the delivery of fuel in some of the most challenging and unstable regions in the world. Syria and Iraq have long struggled with corruption and conflict, and a contractor operating in these environments must navigate successful fuel delivery while also complying with DLA's necessarily stringent requirements. Chief among them is the strict prohibition on sourcing relatively cheap but sanctioned Iranian fuel. For decades, U.S. law and foreign policy sought to address the serious national security threat of Iran acquiring or developing weapons of mass destruction and its widespread support of international terrorism. A key element is denying Iran the financial means of sustaining terrorism and mass destruction capabilities through comprehensive sanctions, including restrictions on petroleum products from Iran.[1]

Relevant here, the Solicitation included several requirements to provide assurance that taxpayer dollars are not being used to purchase Iranian fuel. For instance, offerors must: (1) certify that they will not source or blend any amount of Iranian fuel; (2) provide letters of commitment guaranteeing fuel from non-Iranian sources; (3) provide certificates of quality for proposed fuel sources; (4) describe their supply chain in detail; and (5) provide a transportation plan that charted out a realistic path for fuel to be trucked over lengthy distances that does not include—neighboring Iran.

---

[1] Iran Sanctions Act of 1996, Pub. L. No. 114-277 (as amended).

These requirements exist for a reason.  As DLA is aware, a number of fuel delivery contractors in the region have been investigated, barred from U.S. military installations, and/or debarred for violating these restrictions in other fuel procurements.  And even in this procurement, nearly all proposals were found technically unacceptable for not clearly demonstrating the ability to obtain and deliver compliant fuel.

In this competition, where awards were to be made to firms submitting the lowest-price technically acceptable proposals, offerors had ample incentive to cut corners and source cheap Iranian fuel.  Indeed, Shanica and Hawax, the two offerors submitting the lowest prices for 16 out of 17 contract line items, engaged in egregious and unusual misconduct.  Both companies ███████████████████████████████████████████████████████████████ ████████████████████████████████████████.  Both companies submitted ██████████ ███████████████████████████████████████, raising serious questions that the companies colluded in submitting proposals—a particularly acute concern given RCI's report to DLA that the companies are affiliated, alter-egos, and owned by members of the same family.  Both companies submitted ███████████████████████████████████████.

If that were not enough, and consistent with DLA's requirement to deliver fuel in some of the most corrupt regions in the world, RCI's incumbent contract includes an atypical requirement to disclose any evidence of potential fraud or wrongdoing.  Pursuant to this obligation, RCI submitted several reports to DLA that Shanica and Hawax engaged in concerning conduct.  These reports were submitted prior to and following DLA's initial award decision in October 2023 and included notifications that: ███████████████████████████████████████████ ███████████████████████████████████████; Shanica is closely affiliated with companies sourcing Iranian fuel and under investigation for fuel irregularities; Hawax procured Iranian fuel

2

and delivered fuel without proper documentation memorializing fuel source and transit route; and

███████████████████████████████████████████████████████████████████████████

████████████ .

Any rational contracting officer would have initiated a serious investigation and ultimately disqualified Shanica and Hawax from the competition for making material misrepresentations, noncompliance with the Solicitation's requirements, and nonresponsibility. Instead, DLA refused to make meaningful inquiries to learn the truth.

The contracting officer's investigative approach was to simply ask the suspects—Shanica and Hawax—whether there was any truth to the accusations. Unsurprisingly, the companies denied wrongdoing and stood behind their proposals. With that not guilty plea, the contracting officer checked government databases to confirm that the companies were not under sanction, and finding none, concluded there was no reason for concern. This was plainly irrational; none of these investigative steps were intended to produce any information relevant to the allegations. With respect to the unusual overlap between the proposals of Shanica and Hawax, the contracting officer dismissed the concerns because the similarities, in his view, did not establish that anything improper or illegal occurred. And the rest of RCI's reports to DLA were apparently disregarded and never investigated. Again, the fundamental lack of interest in meaningfully investigating conflicting claims of ████████████████████████████████████████ renders the contracting officer's determinations arbitrary and capricious and contrary to law. A check-the-box approach was not proportionate to the looming concern that the awardees would source prohibited Iranian fuel, contrary to U.S. law and foreign policy.

Finally, in conducting the price realism analysis, the contracting officer applied similarly illogical reasoning: a price is not too low if it is "close" to the next lowest price. Relying on this

███████████████████████████████████████████████████████

truism presented merely a vague appearance of analysis, nothing more. The contracting officer thus failed to consider the actual performance risk posed by the unrealistically low prices of Shanica and Hawax—and, in turn, the risk that the companies would deliver lower-cost Iranian fuel.

RCI respectfully requests that this Court grant RCI's MJAR.

## II. ISSUES PRESENTED

1. Whether the irreconcilable/conflicting letters of commitment in the awardees' proposals amounted to material misrepresentations warranting disqualification or were otherwise inconsistent with the Solicitation requirements.

2. Whether DLA performed an irrational price realism evaluation where the contracting officer found the lowest price realistic solely because it was relatively close to the next lowest price.

3. Whether the contracting officer conducted a reasonable investigation into the improper conduct of Shanica and Hawax and reasonably documented a responsibility determination in accordance with procurement law.

4. Whether RCI is entitled to permanent injunctive relief where the record evidences non-speculative irreparable harm and the overriding public interest rests with ensuring a fair procurement competition.

## III. RELEVANT FACTUAL BACKGROUND

### A. The Solicitation

The Agency issued the Solicitation on April 27, 2023, seeking proposals for the delivery of fuel in Syria and Erbil, Iraq. (AR, Tab 1, at 1–2.)[2] The Solicitation contemplated the award of

---

[2] For ease of reference, citations to the administrative record refer to the bates-labeled page

4

17 contract line items ("CLINs"), each with a specific fuel type, quantity, and location. (*Id.* at 2, 6–13.) CLINs 1–13 covered fuel delivery in Syria (the "Syria CLINs") and were competed together as "All or NONE." (*Id.* at 2, 6–11.) CLINs 14–17 covered fuel delivery in Erbil, Iraq (the "Iraq CLINs") and were competed individually, at the CLIN-level. (*Id.* at 2, 12–13.) Using a lowest price, technically acceptable ("LPTA") source selection method, the Agency would award contracts "to the responsible Offeror whose offer conforming to the [S]olicitation will be most advantageous to the Government, price and other factors considered." (*Id.* at 148.)

The RFP repeatedly emphasized the Government's longstanding prohibition against Iranian fuel. Specifically, the Solicitation stated:

> Any violation of the Iran Sanctions Act is ***strictly forbidden***. Contractor shall not source nor blend ***any portion*** of the fuel destined for DLA Energy with refined fuel products sourced from Iran. In accordance with FAR 52.212-3 – OFFEROR REPRESENTATIONS AND CERTIFICATIONS – COMMERCIAL ITEMS (DEC 2022), by submission of its offer, the offeror certifies that the offeror, or any person owned or controlled by the offeror, does not engage in any activities for which sanctions may be imposed under section 5 of the Iran Sanctions Act.

(*Id.* at 2 (emphasis added)[3], 14 (repeating prohibition); *see id.* at 134 (prohibition on contracting with entities engaging in activities or transactions relating to Iran).)

The Agency reiterated the prohibition on Iranian fuel in response to a bidder's question, noting specifically that Certificates of Quality and/or Analysis ("COQ"/"COA") "are required from where the fuel is being sourced in accordance with the Solicitation." (AR, Tab 9 at 164.)

---

numbers rather than the ECF page numbers.

[3] All emphases are added unless otherwise noted.

5

**B.     Evaluation Criteria**

Section M of the RFP outlined the proposal evaluation criteria.  First, offerors' proposals would be screened for three "Gateway Steps."  (AR, Tab 1 at 148.)  At step 1, offerors were required to be fully registered in the Joint Contingency Contracting System ("JCCS").  (*Id.*)  At step 2, offerors were required to demonstrate and provide evidence of their ability to gain access into the Erbil Air Base ("EAB").  (*Id.*)  At step 3, offerors were required to demonstrate and provide evidence of their ability to gain access into Syria.  (*Id.*)  Failure to meet the preliminary "Gateway Steps" resulted in elimination from the competition.

The Agency would then review offerors' proposals under three evaluation factors:  (1) Technical Capability; (2) Past Performance; and (3) Price.  (*Id.*)

**1.     Technical Capability**

The Technical Capability factor included three subfactors:  Supply; Transportation; and Storage/Distribution.  (*Id.*)  Proposals would receive a rating of Acceptable or Unacceptable under each subfactor, and an Unacceptable rating in any subfactor would result in elimination from the competition.  (*Id.* at 149–50.)

Under Subfactor 1, Supply, the Agency would evaluate the offeror's ability to supply all the products listed in the Solicitation's estimated quantities.  (*Id.*)   The Solicitation required offerors to submit:  "A detailed description and a map or chart of the offeror's supply chain, from vendor source to final delivery"; "[a] complete Fuel Source Data Sheet Attachment 3"; "[a]ll Source letters of commitment"; and "[c]ertificates of Quality and/or Analysis . . . for all products listed in the attached schedule[.]"  (*Id.*)

Under Subfactor 2, Transportation, the Agency would evaluate the offeror's ability to "arrange and execute transportation to support orders placed under contract and its schedule."  (*Id.*)

6

The Solicitation required offerors to submit: "A detailed description of the offeror's plan and movement of product(s) to the locations listed in the [S]olicitation schedule"; "[a] list and description of all leased and owned transportation modes to be used and/or available for use under this contract"; and "[a]ll transportation asset letters of commitment[.]" (*Id.*)

Under Subfactor 3, Storage, DLA would evaluate the offeror's ability to "provide sufficient intermediate storage throughout the life of the contract to support daily deliveries." (*Id.* at 150.)

### 2. Past Performance

Under the Past Performance factor, DLA would evaluate the offeror's past performance references from three current or previously performed contracts. (*Id.*) The Agency would assess these references for relevancy and quality based on how well the contractor performed on projects of similar dollar value, scope, and complexity. (*Id.*) DLA would score offerors on an Acceptable/Unacceptable basis. (*Id.*)

### 3. Price

The Solicitation instructed offerors to propose a price per gallon for each CLIN using the RFP's Attachment 1, Price Data Sheet, depicted below. (*Id.* at 145–46.)

| CLIN | Estimated Quantity (USG) | Reference Price: 1 December 2022 | Differential/Expenses | TOTAL OFFER PRICE (USD) |
|------|--------------------------|----------------------------------|-----------------------|--------------------------|
| | | Solicitation: SPE605-23-R-0209 - Syria/Iraq-Erbil | | |
| 0001 | 1,440,000 | $2.780097 | | |
| 0002 | 1,680,000 | $2.780097 | | |
| 0003 | 1,680,000 | $2.780097 | | |
| 0004 | 360,000 | $3.198901 | | |
| 0005 | 150,000 | $3.198901 | | |
| 0006 | 5,580,000 | $2.780097 | | |
| 0007 | 300,000 | $3.198901 | | |
| 0008 | 300,000 | $3.198901 | | |
| 0009 | 1,740,000 | $2.780097 | | |
| 0010 | 1,440,000 | $3.198901 | | |
| 0011 | 1,440,000 | $2.780097 | | |
| 0012 | 30,000 | $2.591556 | | |
| 0013 | 86,400 | $3.198901 | | |
| 0014 | 1,740,000 | $2.591556 | | |
| 0015 | 1,296,000 | $2.780097 | | |
| 0016 | 5,761,200 | $2.780097 | | |
| 0017 | 16,507,200 | $3.198901 | | |
| TOTAL | | | | |

An offeror's "total offer price" for a particular CLIN reflected the sum of a Government-provided "reference price" per gallon, plus the offeror's differential expenses (*i.e.*, markup). (*Id.* at 151.)

For evaluation, the total estimated price would be determined by multiplying the offered unit price per gallon for each individual CLIN by the estimated quantity stated in the Solicitation schedule. (*Id.*) The Agency would perform a price realism analysis to "determine if a low price reflects the contractor's ability to understand the inherent risk in the requirement." (*Id.*; *see also* AR, Tab 9 at 164 (Price realism will be performed by understanding the market place and the requirement. Prices proposed should be competitive. If proposed prices appear extremely low, then the offeror either doesn't understand the requirement/environment or is low-balling the price.")

### C. Proposal Submissions

Nineteen offerors, including RCI, Hawax, and Shanica, submitted timely proposals by the June 22, 2023, deadline.[4] RCI's proposal thoroughly addressed its approach to supplying fuel from stable, approved sources. (*See* AR, Tab 16 at 196–203.) RCI submitted all required information, ▮▮▮▮▮▮▮▮▮▮▮ including ▮▮▮▮▮▮▮▮▮▮▮ . (*Id.* at 17, 19–20.) RCI detailed its plan to transport fuel, specifically identifying its fuel trucks and driver fleet, and noting that ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (*Id.* at 198, 200–21.) RCI's submission further explained the company's storage plan,

---

[4] Amendment 5 to the RFP extended the proposal deadline to June 22, 2023. (AR, Tab 15 at 176–77.)

including ███████████████. (*Id.* at 208–15.) RCI offered competitive and realistic prices for all CLINs.

While Shanica also submitted bids for all CLINs, Hawax ████████████████████ ██████. Both Shanica and Hawax ostensibly responded to the Solicitation requirements and provided Fuel Source Data Sheets and letters of commitment from suppliers. (AR, Tabs 19, 21.)

Notably, ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ (*Compare* AR, Tab 19 at 524–25 *with* Tab 21 at 825–26.) ██████████████████████████████████

████████████████████████████████████████

████████████████████████████

The Shanica and Hawax proposals also included ████████████████████ ████████████████████████████████████████ (*Compare* AR, Tab 19 at 529–30 *with* Tab 21 at 828, 830.) Moreover, Shanica's and Hawax's proposals contained ████████████████████████████████████████ (*Compare* AR, Tab 19 at 542–51 *with* Tab 21 at 836–46.) Such glaring similarities between proposals are red flags for collusive bidding in public procurement.

### D.    Evaluation, Source Selection, and Award

DLA eliminated 13 of 19 offerors ████████████████████████████ (AR, Tab 24 at 874–876.) Of the six remaining proposals, DLA further eliminated three offerors due to ████████████████████████████████████████ ████████████████████████████████████████ (*Id.* at 884–86; *id.* at 886.) Only RCI, Shanica, and Hawax remained in the competition.

9



DLA found that RCI, Shanica, and Hawax passed the Gateway Steps and received Acceptable ratings in all non-price factors.  Under Subfactor 1, Supply, DLA determined that all three offerors "provided acceptable supply chain from vendor source to final delivery and letters of commitment" with "[a]ll COAs/COQs . . . deemed technically acceptable . . . for each fuel type." (*Id.* at 884–85.)  Under Subfactor 2, Transportation, DLA determined that all three offerors provided "a list of vehicles for transportation modes to be used under this contract and asset letters of commitment." (*Id.*)

For the Syria CLINs (1–13), the Agency thus decided between RCI and Shanica on an LPTA basis as the only remaining eligible offerors.  (*Id.* at 889–90.)  Similarly, for Iraq CLINs (14–17), the Agency decided between RCI, Shanica, and Hawax for each CLIN on an LPTA basis. (*Id.* at 890–91.)   On October 25, 2023, DLA notified offerors of its decision to award Shanica a contract for the Syria CLINs 1–13; RCI a contract for Iraq CLIN 14, and Hawax a contract for Iraq CLINs 15–17.  (AR, Tab 25 at 895; Tab 26 at 975; Tab 27 at 1042.)

### E.    RCI Notices, Government Accountability Office ("GAO") Protests and Corrective Action

Pursuant to its ongoing contractual obligations under the incumbent contract to disclose any evidence of potential fraud or wrongdoing, RCI submitted letters to DLA on the following dates: (1) ███████████████████████████████████████. (AR, Tab 11 at 168–70; Tab 23 at 863–64; Tab 30 at 1052–60; Tab 60 at 1691–93.)  Two of these notices precede the close of bidding in this procurement, one follows shortly after contract award, and another during the second GAO protest.  Each time, DLA disregarded or diminished RCI's reports of improprieties despite credible evidence of wrongdoing by Shanica and/or Hawax.

10

11

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████

In response to the protest, on November 27, 2023, the Agency announced voluntary corrective action. DLA committed to investigate the PIA violations and take appropriate action, if warranted; to reevaluate price realism; and to review the remaining protest grounds and take any appropriate corrective action. (AR, Tab 33 at 1284.) In light of DLA's corrective action, GAO dismissed RCI's protest as academic. (AR, Tab 34 at 1286.)

On January 18, 2024, DLA notified RCI that the Agency had completed its corrective action and reaffirmed its original award decisions: CLINs 1–13 to Shanica; CLIN 14 to RCI; and CLINs 15–17 to Hawax. (AR, Tab 109 at 5564.) DLA represented, without providing any further support, that it had conducted a PIA investigation and determined there was no violation or impact on the procurement and provided no additional information about the investigation or RCI's prior protest grounds. (AR, Tab 109 at 5564.)

On January 23, 2024, RCI filed a second protest of the awards to Shanica and Hawax at GAO raising similar arguments. RCI further challenged the adequacy of DLA's PIA investigation. (AR, Tab 47 at 1349.)

On February 16, 2024, RCI sent DLA a fourth disclosure letter informing the Agency of possible fraud and wrongdoing by Hawax. (AR, Tab 60 at 1691–93.) RCI's letter explained its understanding that, in another contract, Hawax procured Iranian fuel and also delivered fuel without proper documentation memorializing fuel source and transit route. (*Id.* at 1691–92.) RCI's letter also reported ████████████████████████████████████████

12

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

During the second GAO protest, the Agency produced documents showing the Agency's corrective action investigation. The materials revealed that, rather than conduct a thorough, independent investigation into the veracity of the proposal representations at issue—*e.g.*, whether Shanica and Hawax misrepresented their source of fuel and transportation—DLA merely reviewed governmental databases to confirm that neither Shanica nor Hawax was under sanction or restriction, re-reviewed the proposals, and allowed Shanica and Hawax to reaffirm their prior misrepresentations without any further scrutiny. (AR, Tabs 38 at 1298–1300; Tab 39 at 1305–06.)

Specifically, during the corrective action, DLA sent separate questionnaires to Shanica and Hawax and requested "re-confirmation" of elements of their proposals. The contracting officer's questionnaire asked: "[P]lease confirm that you will not source any fuel from a prohibited source";

████████████████████████████████████████████████████

████████████████████ and "confirm [the company] did not have any knowledge of any other offeror or potential offeror's pricing when the company submitted its offer." (AR, Tab 36 at 1289–91; *see also* Tab 35 at 1287–88.) The contracting officer did not independently investigate whether Shanica and Hawax misrepresented their source of fuel and transportation plans. The contracting officer simply asked the companies accused of making fraudulent statements whether they made fraudulent statements, and then accepted their "confirmations" at face value. (AR, Tab 38 at 1297–1304; Tab 39 at 1305–13.)

DLA also overlooked significant issues apparent from the Shanica and Hawax proposals.

████████████████████████████████████████████████████

13

████████████████████████████████████████████



(AR, Tab 38 at 1304.)

(*Id.* at 1300; Tab 39 at 1309.)

Hawax further explained that

and that

(AR, Tab 39 at 1312.) The contracting officer found these explanations "reasonable" and summarily concluded that "the similarity among proposals is not a sufficient basis" to find Shanica or Hawax nonresponsible. (*Id.*; AR, Tab 38 at 1304.)

The contracting officer also did not address that

The contracting officer also performed a flawed price realism assessment during corrective action. The contracting officer's Price Realism Memorandum shows no consideration of the marketplace or the requirements when assessing whether Shanica and Hawax's prices were realistic. (AR, Tab 37 at 1292–96.) Instead, the contracting officer irrationally relied on a comparison of offerors' pricing to one another but did not consider whether both Shanica and Hawax's prices were too low for the marketplace and the requirements. (*Id.* at 1293–95.)

Given the ever-evolving developments relevant to the procurement and desire for thorough judicial review, RCI filed a Complaint in this Court on April 19, 2024. (ECF No. 1.) Accordingly, GAO dismissed the second protest due to the concurrent litigation. (AR, Tab 63 at 1697.) On

April 24, 2024, the Government moved the Court to seek an advisory opinion from GAO, which the Court granted. (ECF Nos. 8, 11.) On May 9, 2024, GAO issued an advisory opinion explaining that it did not have a basis to sustain RCI's protest. (ECF No. 20.)

## IV.    STANDARD OF REVIEW

An agency's action is judged under the standards set out in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). The proper inquiry is whether, based on a preponderance of the evidence, the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 412 (2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004)). Under this standard, the Court is to set aside an agency decision if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

With respect to the first ground, an agency's procurement decision is "arbitrary and capricious" where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (internal quotation marks omitted) (alteration in original). Thus, a procurement decision should be set aside where the agency action "does not evince rational reasoning and consideration of [the] relevant factors." *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021) (internal quotation marks and alteration omitted). With respect to the second ground, "the disappointed bidder must show a clear and prejudicial violation of

15

applicable statutes or regulations." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quotation marks omitted).

Next, if the agency action is found to be unlawful or otherwise irrational, the protester must also show that it was harmed—*i.e.*, that had it not been for the agency's error, "it would have had a substantial chance of securing the contract." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009). In this regard, a plaintiff will "prevail in a bid protest" if it shows "a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quotation marks omitted). The test for establishing prejudice "is more lenient than showing actual causation, that is, showing that but for the errors [the protester] would have won the contract." *Bannum*, 404 F.3d at 1358.

## V. ARGUMENT

### A. The Shanica and Hawax Proposals Contain Material Misrepresentations.

#### 1. Legal Standard

The "Federal Circuit has all but explicitly recognized that a plaintiff may object to a contract award on the grounds that a proposal contained a material misrepresentation." *Golden IT, LLC v. United States*, 157 Fed Cl. 680, 700–01 (2022) (discussing *Plan. Rsch. Corp. v. United States*, 971 F.2d 736 (Fed. Cir. 1992)).

"To establish a material misrepresentation, a protester must demonstrate that (1) the awardee made a false statement; and (2) the agency relied upon that false statement in selecting the awardee's proposal for the contract award." *Connected Glob. Sols., LLC v. United States*, 162 Fed. Cl. 720, 744-45 (2022) (cleaned up); *Alaska Structures, Inc. v. United States*, 144 Fed. Cl. 80, 84 (2019) ("A material misrepresentation exists when a bidder makes an incorrect statement upon which the procuring agency relies in awarding the contract."). Decisions of this Court are

divided as to whether a material misrepresentation claim requires evidence of intent. *Compare Alaska Structures*, 144 Fed. Cl. at 84 ("The bidder must also intend the incorrect statement"), *with Connected Glob. Sols.*, 162 Fed. Cl. at 746 ("intent is immaterial….").

A material proposal misrepresentation generally requires that the offeror be disqualified from the competition to safeguard the integrity of the procurement process. *See Alaska Structures*, 144 Fed. Cl. at 84 ("As material, intentional misrepresentations taint the award process, prevent government officials from determining the best value to the government, and retard the competitive bidding process, an offeror who is found to have made such a misrepresentation will lose its right to execute the solicited work or bid on the reprocurement of the contract." (alterations omitted) (quoting *Algese 2 S.c.a.r.l. v. United States*, 125 Fed. Cl. 431, 440 (2016)); *Golden IT*, 157 Fed Cl. at 701 (compiling cases).

### 2. The administrative record confirms that the Shanica and Hawax proposals contain material misrepresentations.

The Solicitation required offerors to provide, as part of their technical proposals, a "detailed description and a map or chart of the offerors' supply chain, from vendor source to final Delivery." (AR, Tab 1 at 145.) ███████████████████████████████████████

██████████████████████████ (AR, Tab 19 at 521, 524–25; Tab 21 at 823, 825–26.) The Solicitation thus required Shanica and Hawax to provide "[s]ource letters of commitments" from those refineries, including, among other things, "[r]eference to specific and current Solicitation number," "[r]eference to Product being offered for supply," and a signature from the "owner/president/CEO of the company providing the service." (AR, Tab 1 at 145; Tab 3 at 155.) DLA was expressly required to evaluate these letters of commitment. (AR, Tab 1 at 149.)

To meet the Solicitation requirements, ████████████████████████████████████

████████████████████████████████████████████████████████████

17

████████████████████████████████████████████████████████████



████████████  By definition, an "exclusive license" is a "license that gives the licensee the ***sole right*** to perform the licensed act, often in a defined territory, and that prohibits the licensor from performing the licensed act and from granting the right to anyone else." LICENSE, *Black's Law Dictionary* (11th ed. 2019). ████████████████████

---

[5] AR, Tab 21 at 825.
[6] AR, Tab 19 at 525.
[7] AR, Tab 21 at 826.
[8] AR, Tab 19 at 524.



These seemingly false proposal representations in the Shanica and Hawax source letters of commitment are material because DLA relied on the letters of commitment when determining that Shanica and Hawax were technically acceptable. By the Solicitation's own rules, neither Shanica nor Hawax could receive award without providing letters of commitment from proposed fuel suppliers. (AR, Tab 1 at 145, 149.) Accordingly, DLA necessarily relied on the accuracy of the Shanica and Hawax representations ██████████████████████████████████████ ██████ as part of the evaluation and award decision. *See Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 142 (2023) ("A misrepresentation is material when it was made intentionally and relates to a requirement of the solicitation"); *Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 102–03 (2021) (solicitation requirement to provide teaming agreements was material), *appeal docketed, No. 22-1556* (Fed. Cir. Mar. 22, 2022).

To the extent intent is relevant, circumstantial evidence confirms that the misrepresentations are intentional. Where a misrepresentation is directly related to a material

19



solicitation requirement, that is sufficient circumstantial evidence to find an intent to mislead. *See Glob. K9 Prot. Grp., LLC*, 169 Fed. Cl. at 142 (citing *Klein v. Peterson*, 866 F.2d 412 (Fed. Cir. 1989)). Here, Shanica and Hawax submitted false letters of commitment in direct response to material Solicitation requirements; under these circumstances, there is sufficient evidence to find that the misrepresentations were made with the intent to mislead. *See id.* at 143 ("K2's false statements, however, directly related to these Solicitation requirements and are sufficient 'to sustain [a] ... finding' K2 'intended to mislead.'" (quoting *Klein*, 866 F.2d at 415) (alterations in original)).

Accordingly, the administrative record contains all the facts needed for this Court to conclude that the Shanica and Hawax proposals contain intentional, material misrepresentations. Those misrepresentations are plainly prejudicial to RCI. But for the misrepresentations the Hawax and Shanica proposals would, at a minimum, have been rejected as technically unacceptable for failure to provide the required source letters of commitment; or, more appropriately, Shanica and Hawax would have been excluded from the competition entirely. In either event, RCI is left as the only offeror eligible to receive award of the CLINs that DLA awarded to Hawax and Shanica. *See Glob. K9 Prot. Grp.*, 169 Fed. Cl. at 150 ("But for K2's misrepresentations and the USPS's reliance on the misrepresentations, GK9 would have had a substantial chance of securing awards for the International, Southwest, and Northwest Clusters, which GK9 bid on but USPS awarded to K2.").

### 3. To the extent necessary, remand or limited discovery are warranted to determine whether the proposals contain material misrepresentations.

To the extent this Court is unable to determine whether the Shanica and Hawax proposals contain material misrepresentations based on the administrative record alone, the Court has at least two options to resolve the issue. First, the Court can remand this matter to DLA with instructions

to address the apparent misrepresentations. *See* 28 U.S.C. § 1491(a)(2); RCFC 52.2; *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 65 (2022) (discussing remand authority).

Second, the Court may, to the extent necessary, authorize RCI to seek limited discovery from the ████████████████████ to obtain additional information needed to resolve any remaining questions regarding RCI's allegations of material misrepresentation.[9] While discovery is rare in bid protests, and this Court's review is generally limited to the administrative record, the unique nature of material misrepresentation claims often break that mold and require this Court to consider evidence outside the administrative record obtained through limited discovery. *See Connected Glob. Sols. v. United States*, 159 Fed. Cl. at, 806-07 (2022) (discussing standards, granting protester's motion for limited discovery as necessary to permit judicial review of material misrepresentation claim); *Golden IT, LLC*, 157 Fed. Cl. at 701–02 (recognizing potential need for discovery to establish material misrepresentation); *Orion Int'l Tech. v. United States*, 60 Fed. Cl. 338, 343 (2004) (discovery warranted for "relevant information that by its very nature would not be found in an agency record – such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations" (footnotes omitted)).

To be clear—the administrative record before this Court already contains sufficient evidence to find a material misrepresentation in the Hawax and Shanica proposals. To the extent this Court concludes that additional evidence is necessary to determine whether the elements of

---

[9] RCI attaches to this MJAR proposed interrogatories, as Exhibit 1, which are narrowly tailored to elicit relevant information ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ *See* RCFC 28(b)(1)(B) (authorizing depositions through letters of request); RCFC 31(a) (authorizing depositions on written questions). If necessary, RCI can also serve the ████████████

material misrepresentation are satisfied, then this Court should enable the parties to obtain and produce that additional information—either by remanding this matter back to DLA to further investigate the issue, or by authorizing RCI to conduct limited discovery.[10]

**B.      The Hawax and Shanica proposals are technically deficient; DLA improperly relaxed a material Solicitation requirement by selecting those proposals for award.**

"The Federal Circuit has stated that 'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 142 (2021) (quoting *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011)).

The Solicitation contained material requirements that each offeror must provide DLA with documentation, *i.e.*, "all [s]ource letters of commitments," substantiating the offeror's relationship with each fuel supplier to be used during performance; such submissions were a precondition to each offeror's technical acceptability, which DLA was required to evaluate. (AR, Tab 1 at 145, 149.) An offeror's representations regarding its source of supply for fuel deliveries necessarily impacts the quantity, quality, and delivery of the fuel. Accordingly, the Solicitation's requirements to submit evidence of all source letters of commitment are "material." *Mortg. Contracting*, 153 Fed. Cl. at 142 ("A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the proposal." (cleaned up)).

---

[10] Depending on various factors (*e.g.*, the Court's resolution of RCI's remaining claims, the status of DLA's voluntary stay, and facts on the ground in Iraq and Syria) the Court may eventually need to consider means to preserve the *status quo* pending any such remand or discovery, including the need for emergency or preliminary injunctive relief.

As established above, in response to the Solicitation's material requirements, ███████ ████████████████████████████████████████████████████████ (AR, Tab 19 at 521, 524–25; Tab 21 at 823, 825–26.) Accordingly, to be technically acceptable, Shanica and Hawax were each required to include in their proposals documentation of their ███████ ████████████████████████████████████████ (AR, Tab 1 at 149.) To meet the Solicitation requirements, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ (*Compare* AR, Tab 19 at 65–66 *with* Tab 21 at 91–92.)

████████████████████████████████████████████████████████

████████████████████████████████████ Taken together, the purported ███████ ████████████████████████████ necessarily false and cannot be relied on to satisfy the Solicitation's material requirement for letters of supply commitment. In other words, a proposal that falsely represents ████████████████████████████████ is also technically unacceptable under the Solicitation for failure to provide evidence of a valid supplier arrangement ████████████████████████████████ Based on the record evidence before DLA, the contracting officer could not proceed to make award to the Hawax or Shanica proposals, because the required letters of supply are manifestly inadequate and false. Based on the proposals submitted, the contracting officer could not rationally determine whether Hawax or Shanica have any commitment at all from the ████████████████████ and thus the contracting officer could not rationally determine that the Hawax or Shanica proposals were technically acceptable.

In these circumstances, because the proposals from Hawax and Shanica did not meet the requirements, DLA had to reject the proposals, amend the Solicitation and invite revised proposals,

23

████████████████████████████████████████████████

or open discussions with all offerors in the competitive range (including RCI) to obtain revised proposals. *See WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 273 (2021) (identifying options when agency presented with non-compliant proposal). DLA did not follow any of these paths, instead making award to "non-compliant proposals" that fail to provide valid, mandatory letters of source commitment, "in violation of the Solicitation and, in turn, FAR." *Id.* at 288.

RCI was prejudiced by these violations of law. But for DLA's error, it is at least a realistic possibility that Shanica and Hawax would have been eliminated from the competition, leaving RCI as the only offeror eligible for award. *Id.* at 283 (finding prejudice from waiver of material solicitation requirement where, "[b]ased on the administrative record, there is a realistic possibility that WaveLink could secure an award if the ineligible offerors are removed.").

## C. DLA's Price Realism Analysis Was Irrational

The Agency's price realism assessment was based on nothing more than the appearance of analysis. Rather than meaningfully consider whether Shanica's and Hawax's low prices created a risk of unsuccessful contract performance—the essence of any price realism analysis—the evaluators made flawed assumptions and mathematical miscalculations. DLA's methodology provides no assurance that Shanica's and Hawax's prices are realistic.

### 1. Legal Standard

"[A] price realism analysis examines whether an offeror's prices are unrealistically low for the work to be performed. Thus, a price realism analysis is performed to ensure that an offeror's proposed prices are not so low that contract performance is put at risk or that they evidence a lack of understanding of the solicitation's requirements." *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 598 (2023). Although agencies "enjoy wide latitude" in conducting a realism analysis,

whatever methodology an agency chooses must be "reasonable" and cannot make "irrational assumptions or critical miscalculations." *Id.* at 598–99 (cleaned up).

## 2. DLA's use of a price comparison methodology was irrational.

The Solicitation required DLA to conduct a price realism assessment "to determine if a low price reflects the contractor's ability to understand the inherent risk in the requirement." (AR, Tab 1 at 151.) Further, price realism "will be performed by understanding the market place and the requirement . . . . [i]f proposed prices appear extremely low, then the offeror either doesn't understand the requirement/environment or is low-balling the price." (AR, Tab 9 at 164.) In this procurement where award was to be made to the technically acceptable offeror with the lowest price (AR, Tab 1 at 148–49), it was essential that the Agency conduct a meaningful price realism analysis. After all, because price was the sole competitive discriminator, offerors had every incentive to reduce prices as much as possible to beat out competitors.

DLA's price realism methodology was anything but meaningful. Not only did the contracting officer fail to consider the marketplace or the requirements, he also found prices realistic because there was adequate price competition from *two or three offerors* and because these prices were "close."

Comparing two or three prices against one another was not a rational methodology here: it assumed that a price was realistic so long that it was relatively "close" to the next lowest price. Indeed, relative proximity between prices provides no indication that the lowest-submitted price is also not "too low." It is entirely possible that *both* Shanica and Hawax submitted prices that reflected a risk of unsuccessful performance.

As discussed above, for the Syria CLINs (1-13), only Shanica and RCI were found technically acceptable. (AR, Tab 37 at 1293.) The prices submitted by these two companies were

25

the only inputs used for the price realism analysis. (*Id.*) The contracting officer compared the total prices for all thirteen CLINs; and noting that Shanica's was $1.8 million lower than RCI's price, the contracting officer concluded that Shanica's lower price was realistic because there was "adequate price competition" and "Shanica's price is not significantly lower than RCI's price proposal." (*Id.*) No further explanation is provided.

For the four Erbil CLINs (14-17), Shanica, Hawax, and RCI were found technically acceptable. (*Id.* at 1294.) Here, the contracting officer "used the same methodology" to compare prices from these three offerors against one another, concluding that the lowest price was not unrealistic because there was "adequate price competition," the prices were "reasonably close," and the "market established the competition."[11] (*Id.* at 1294–96.)

For CLIN 15, the contracting officer conducted "further analysis" through a series of comparisons: (a) the second-lowest price (Shanica's) was ▮▮▮▮▮ less than the highest price (RCI's), and (b) the lowest price (Hawax's) was ▮▮▮▮▮ less than the second-lowest price (Shanica). (*Id.* at 1295.) In turn, the contracting officer found that a difference of ▮▮▮▮▮ "between the lowest and the second lowest offeror shows that Hawax's low offer is realistic." (*Id.*)

The contracting officer's analysis is essentially a truism: the lowest price is less than the middle price, and the middle price is less than the highest price. Logically, however, the realism of a price cannot be determined solely by its proximity to the next lowest price. Moreover, that the two lowest prices are grouped closer together than the highest price does not, by itself, provide any assurance that either the lowest price or the second lowest price are not too low or do not present performance risk. Both can be unrealistic, and the fact that there may be a relatively small

---

[11] As discussed below, the contracting officer's imprecise language obfuscated that prices were not, in fact, reasonably close.

delta between the two lowest prices does not automatically make those prices in line with the marketplace and environment.

Consider the following hypothetical. Three telecommunications providers submit bids to supply wireless plans on a per month, per user basis. The bids are $100, $20, and $10. If the government claimed that the $10 bid was realistic because of adequate price competition and the relative proximity to the $20 bid, the court would rightly question the analysis as lacking in rigor and common sense. Without more, the analysis is arbitrary because the agency has no principled way of knowing whether any of the bids are realistic for the work to be performed. The existence of price competition alone—and the relative proximity of the lowest prices—does not provide a rational basis to conclude that the lowest proposed price is, in fact, realistic.

*DigiFlight, Inc. v. United States* is instructive. 165 Fed. Cl. 588. There, three BPA holders submitted quotations, and in conducting the mandated price realism assessment, the evaluators relied on the existence of competition between the awardee and the third bidder, both of which submitted low prices. *Id.* at 595. Specifically, the evaluators found that "[w]hile both companies offered composite rates well below the IGCE composite rates, the Government found that multiple companies offering low composite rates suggested there was no evidence of an attempt to offer unrealistically low prices as a strategy to receive the award." *Id.* at 596.

The protester, who submitted higher prices, argued this was "false logic" because "this line of reasoning 'entirely failed to consider an important aspect of the problem,' which is the possibility that 'both [awardee] and [the third bidder] proposed unrealistic prices." *Id.* at 600.

The court agreed that the agency made an "irrational assumption," explaining that it is "conceivable that two companies—competing for award—would have similar motivations for

lowering the price of their quotations, even to the point of offering unrealistically low prices." *Id.*
The court observed:

> Why is it that one company would bid an unrealistically low price
> (hence the whole reason for a price realism analysis), but two
> offerors would not? Is it not possible that two offerors could have
> underestimated the work required, not understood the requirements,
> or for some reason saw some value in this contract that made it worth
> underbidding? There may be some explanation for the agency's
> conclusion that no two offerors would underbid a contract—the
> Court cannot conceive of one—but to any extent there is, such an
> explanation is not found in the administrative record. And, without
> any explanation in the administrative record as to why this
> seemingly irrational conclusion is, in fact, rational in this case, the
> Court cannot find that this conclusion is reasonable.

*Id.* The same reasoning applies with even greater force here. In *DigiFlight*, the procurement was

conducted using a best-value tradeoff in which price was "not expected" to be the controlling

factor, while here price is the dispositive factor between technically acceptable proposals.

Moreover, unlike in *DigiFlight* where there was no allegation of coordinated proposal submission,

here there is concerning evidence that Shanica and Hawax submitted their proposals in

coordination with each other. Shanica and Hawax had every reason to submit unrealistic prices,

making the contracting officer's circular price realism methodology even more inscrutable. *See*

*Active Network, LLC v. United States*, 130 Fed. Cl. 421, 428 (2017) (price realism analysis was

not satisfactory where it merely "mentions the price of each offeror in the competitive range . . .

listed and organized from lowest price to highest price" but lacked discussion of whether "any of

these prices are realistic in relation to the standards discussed in Section M of the RFP").

At bottom, by relying on a simple price comparison, the Agency did not meaningfully

understand the performance risk posed by Shanica's and Hawax's low prices.

### 3. DLA's realism analysis unreasonably included large government-mandated plug numbers and failed to reasonably assess contractor-proposed differentials.

The contracting officer's price realism analysis was irrational because it included large government-mandated plug numbers. Moreover, although the contracting officer purported to assess the offeror-proposed "differential/expenses," he did so for only one CLIN, and the result was only the appearance of analysis and a further illogical resort to price comparison.

In this competition, the total evaluated price for each CLIN consisted of two components. First, a "reference price," which is a market price for fuel tied to an index and intended to approximate "an offeror's anticipated fuel cost." (AR, Tab 37 at 1295.) The Solicitation designated reference prices for each CLIN, and offerors were required to use these plug numbers. Second, the "differential/expenses" accounted for a category of costs beyond fuel itself, including expenses, transportation, logistics, additives, safety and environmental compliance, and profit. (*See id.*; AR, Tab 31 at 1079-80.) This differential figure was the sole pricing variable that offerors could manipulate. Notably, the government-provided reference price was substantially larger than the offeror-provided reference price. For example, under CLIN 17, Hawax's total offer price was $4.57, but ███████████████████████████████████████████████████ ███████████████████████.[12] (AR, Tab 37 at 1294.)

Including government-provided plug values in the price realism analysis was unreasonable because these values overshadowed the contractor-proposed differentials. In other words, because the plug numbers were a substantial component of the entire total price—sometimes far more than half of the total price—their inclusion artificially minimized the true relative difference between proposed price differentials.

---

[12] Values are rounded to the nearest whole cent.

Considering the same CLIN 15 as an example, the difference between Hawax's lowest price and RCI's highest price is ▇ lower when comparing the total evaluated price, but a whopping ▇% lower when considering only the price differentials. (*See* AR, Tab 37 at 1294, 1295; *see also* Tab 60 at 1685–86.) And yet, rather than exclude the price component mandated by the Government and focus only on the contractor-proposed input, the contracting officer's methodology considered them together, ultimately reaching the vague finding that there is a "modest difference" between Hawax's lowest price and RCI's highest price and that all CLIN 15 prices were "reasonably close." (AR, Tab 37 at 1295.)

This methodology was arbitrary and capricious, not to mention indefensibly imprecise.[13] DLA gained no insight as to whether the prices submitted by Shanica and Hawax "are not so low that contract performance is put at risk or that they evidence a lack of understanding of the solicitation's requirements." *DigiFlight*, 165 Fed. Cl. at 598. A rational price realism analysis would exclude government-provided plug values and instead consider only the differential/expenses proposed by each offeror.

Although the contracting officer claimed to have analyzed the proposed differentials, he attempted to do so for only one CLIN and his analysis was the same rote comparison without any consideration of whether the submitted prices were in fact realistic or presented performance risk. The contracting officer again arranges the prices, calculates the mathematical difference, and concludes that any differences are "modest":

---

[13] In finding the price realism analysis unobjectionable, GAO's advisory opinion did not distinguish between the government-mandated reference price and proposed price differentials, or more broadly the circular logic of DLA's price comparison. Instead, GAO accepted the contracting officer's characterization of the price difference, finding that it was within DLA's discretion to compare prices to competitors' prices "and, upon finding that the differences were *relatively small*, deeming all offerors—including the lowest-priced—to be realistic." (AR, Tab 110 at 5571.)

> For CLIN 15, Hawax's ▮▮▮▮ U.S. gallon differential/expenses adds ▮▮▮▮ /U.S. gallon to its price above and beyond what it reasonably expects to pay for the JP8 under CLIN 0015. This is modestly lower than its competition (Shanica (▮▮ /U.S. gallon) and RCI ($▮▮ /U.S. gallon)). However, there is only an approximately $▮▮ /U.S. gallon difference between Hawax and the next lowest offeror, Shanica, while the difference between Shanica and the highest technically acceptable offeror (RCI) is $▮▮ /U.S. gallon. This reflects a modest range within which offerors may adjust their expenses/costs/profit for the ultimate price offer to the Government. Therefore, Hawax's differential does not make its price so low as to suggest it does not understand the requirement. More importantly, a differential of approximately $▮▮ /U.S. gallon leaves an adequate margin, above and beyond the estimated cost of fuel (the reference price), to cover the remaining costs, expenses, and profit to supply the required fuel. Accordingly, the Contracting Officer evaluated Hawax's price for CLIN 0015 as realistic.

(AR, Tab 37 at 1295.) This analysis is conclusory and lacks basic explanation. The contracting officer never documents what costs and expenses would be necessary to leave an "adequate margin," how much of a margin is "adequate," or how the evaluators calculated total estimated costs and expenses. And what type of cost "adjustment" was the contracting officer expecting, and on what basis? Because the contracting officer failed to articulate any benchmark or coherent analysis, the same vague language could have been applied to any price, no matter how low. *See Active Network, LLC*, 130 Fed. Cl. at 428 (agency made "conclusory" and unsupported statement that "[t]here is no evidence that the Offeror has manipulated their pricing to be unrealistically low in order to 'buy-in'").

Finally, the contracting officer continued this appearance of analysis by relying on the same price comparison rationale for CLINs 16 and 17. (AR, Tab 37 at 1296.) But the methodology did not clearly translate across CLINs. CLINs 15 and 16 were for JP8 fuel, while CLIN 17 was for diesel fuel. (*See* AR, Tab 1 at 12–13). This is a critical distinction since different fuel types have different costs and expenses, as is apparent by the fact that each of the three offerors bid the same

differential price for CLINs 15 and 16 (JP8) but a different price for CLIN 17 (diesel). (*See* AR, Tab 37 at 1294; *see also* Tab 31 at 1079–80.) Thus, even if the contracting officer had carefully considered the costs associated with supplying JP8—and he did not—the CLIN 15 analysis cannot be simply transferred to CLIN 17.

In summary, DLA's price realism methodology irrationally included government-provided plug numbers which created the misperception that proposed prices were closer than they appeared, and also failed to meaningfully assess the only price component submitted by offerors.

### 4.  The Agency's comparison of average prices was a meaningless metric and relied on incorrect computations.

To the extent it is applicable, DLA committed one final error in the price realism analysis. In a section of the selection decision titled "fair and reasonable determination"—*i.e.*, whether prices were too high, not too low—the selection authority included Table 14 that purported to show a "comparison of average prices paid for [historical One-Time Buys ("OTBs")] compared to the average prices offered by the three awardees in their offers for each fuel type." (AR, Tab 24 at 892–93.)

**Table 14 – Average Price Paid Compared to Average Award Prices**

|  | Shanica | RCL | Hawax | Average Price Offered | Avg Price Paid in Past | Difference |
|---|---|---|---|---|---|---|
| JP8 | | | | | $ 5.836010 | $ (1.14) |
| Diesel | | | | | $ 5.507022 | $ (0.38) |
| MUM | | | | | $ 4.679325 | $ (0.07) |

(*Id.* at 893.)

GAO's advisory opinion found that the contracting officer's price realism assessment was "reasonable and consistent with the terms of the RFP," in part based on the comparison set forth in this table. (AR, Tab 110 at 5571.) This finding was misplaced for several reasons.

32

As an initial point, the selection decision contains no discussion of price realism, only price reasonableness. These are distinct concepts. *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 21 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013). Table 14 was included as part of the selection decision's assessment of reasonableness, not realism. (AR, Tab 24 at 892–93.) GAO's citation to the data is misplaced.

Second, GAO misconstrued the table, stating that it compared the "***lowest price***" offered by offerors to the "historical average" for each type of fuel. (AR, Tab 110 at 5571.) But Table 14 purports to show a different methodology that calculated a composite average—*i.e.*, an average of each offeror's price for each type of fuel, then averaged across all three offerors—and compared that composite average to the historical average. (AR, Tab 24 at 892–93.) Lowest prices were not part of the analysis.

Third, and even if Table 14 set out to calculate a composite average, it was mathematically incorrect or otherwise missing data. The column "Average Price Offered" purports to calculate an average of the three average prices submitted by Shanica, RCI, and Hawax, but the values are incorrect. (*See id.* at 893.) To take JP8 as an example, the average of $██████ + ██████ + $██████ is $██████, not $██████ as represented in the table. (*See id.*) The same errors repeat for the remaining two types of fuel.

In sum, Table 14 was not relevant to the Agency's price realism analysis, nor was it mathematically accurate. GAO's reliance on it was arbitrary and capricious.

*　　*　　*

DLA's price realism assessment never grappled with whether offerors' prices were sufficient to cover the actual costs associated with supplying fuel to the Government in an insecure region of the world where corruption is rampant. This alone reflects an inadequate realism

33

evaluation, and the protest should be sustained on this basis. Had the contracting officer performed a proper price realism assessment, the Agency would have recognized the serious risk inherent in the prices offered by Hawax and Shanica and found them unacceptable for award.

**D.     The Agency's Corrective Action Investigation Was Arbitrary, Capricious, And Otherwise Contrary to Law.**

The Agency's investigation of serious irregularities and improper conduct by Shanica and Hawax was inadequate and raises doubts about the integrity of the procurement. The contracting officer failed to meaningfully investigate RCI's credible reports, instead relying on denials by the very companies accused of misconduct and perfunctory checks of government databases. By failing to apply scrutiny to highly unusual proposal similarities and other irregularities, DLA exhibited "a lack of curiosity that [is] ostrich-like." *Oak Grove Techs.*, 155 Fed. Cl. at 116.

While contracting officers are afforded considerable discretion in the procurement process, *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004), "a court should not 'defer to the agency's conclusory or unsupported suppositions.'" *Oak Grove Techs.*, 155 Fed. Cl. at 102 (quoting *McDonnell Douglas Corp. v. U.S. Dept. of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)). This is especially true where "the agency's decision 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)). The Agency's failure to meaningfully investigate is patently unreasonable, and the awards to Shanica and Hawax must be set aside on this basis. *See Banknote*, 365 F.3d at 1351; *Oak Grove Techs.*, 155 Fed. Cl. at 119.

### 1. The contracting officer irrationally failed to meaningfully consider credible evidence of improprieties by Shanica and Hawax.

On at least four occasions, RCI reported to the Agency irregularities and improprieties involving Shanica and Hawax relating to the competition, including that Shanica and Hawax are closely affiliated; that Shanica and Hawax source prohibited Iranian fuel and circumvent requirements to memorialize fuel source and transit routes; and that Shanica and Hawax lack the transportation assets needed to perform. (AR, Tab 11 at 168–70; Tab 23 at 863–64; Tab 30 at 1052–60; Tab 60 at 1691–93.) However, the contracting officer arbitrarily discounted RCI's reports and failed to adequately investigate the allegations.



Rather than thoroughly investigate these serious allegations, DLA merely asked Shanica (the company accused of misconduct) to confirm it complied with "all applicable laws and regulations in obtaining the required licenses and authorization for fuel supply in Syria and Erbil," including the provisions regarding kickbacks and procurement integrity. (AR, Tab 35 at 1288; *see also* Tab 38 at 1297–99.)

Rather than

35

meaningfully investigate ███████████████ DLA again merely asked Shanica to confirm that

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ (AR, Tab

35 at 1288; *see also* Tab 38 at 1300–02.)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ While it appears DLA investigated the alleged

PIA violations to some degree by reviewing offerors' proposed prices and contacting its Middle

East office and source selection team, (AR, Tab 40 at 1315, 1318–1319), the Agency's only

investigation into the allegation that Shanica and Hawax were affiliated (if not the same company)

was by asking Shanica and Hawax to confirm that neither "had an affiliate that submitted an offer

under the Solicitation." (*Id.* at 1323; *see also* Tab 35 at 1288; Tab 36 at 1291.)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████ Although this information was known to DLA prior to the filing

of the Agency Report at GAO, no further investigation was conducted.

36

████████████████████████████████████

In sum, RCI provided two reports prior to proposal submission, one followed shortly after contract award, and one during the second GAO protest. Yet each time the Agency disregarded RCI's reports of improprieties despite credible evidence of wrongdoing by Shanica and Hawax. As discussed further below, rather than take seriously these allegations by conducting a serious investigation that sought out relevant evidence, DLA simply asked the accused companies to confirm they had done nothing wrong.

### 2. The contracting officer irrationally performed an inadequate and perfunctory investigation.

Despite serious questions regarding the fairness and integrity of the procurement, the contracting officer performed an inadequate and irrational investigation. The contracting officer's investigation was limited to three tasks: (1) reviewing government databases to confirm that neither Shanica nor Hawax was under sanction or restriction; (2) re-reviewing Shanica's and Hawax's proposals; and (3) asking Shanica and Hawax to re-affirm their proposals. (AR, Tab 38 at 1298–1304; Tab 39 at 1305–1313.) None of these tasks could have possibly uncovered any relevant evidence. The proposals submitted by Shanica and Hawax would not, on closer review, concede that their representations were false, nor would representatives of those companies provide similar admissions when prompted to re-affirm their proposals. And the government databases would not contain any relevant information unless the Government had already conducted *and concluded* an investigation into the very conduct at issue. The contracting officer's investigation was nothing more than the appearance of inquiry. Indeed, the investigation lacked any independent assessment of the proposals' veracity, *e.g.*, interviews or follow up with parties other than Shanica and Hawax.

For the governmental databases review, the CO searched the System for Award Management ("SAM"), the U.S. Department of Commerce Bureau of Industry & Security's

("BIS") Denied Person List and the U.S Department of Treasury Office of Foreign Asset Control's ("OFAC") Specially Designated Nationals and Blocked Persons List. These searches were to confirm that Shanica and Hawax (nor its officers) were under sanction or restriction and that "there was no exclusion or derogatory information at sam.gov." (AR, Tab 38 at 1298; *see also* Tab 39 at 1306.) But the contracting officer would not reasonably expect to find that Shanica or Hawax were debarred or subject to sanctions; any such finding would only be reached after an investigation like the very one warranted by RCI's disclosures.

Next, the CO re-reviewed Shanica and Hawax's proposals. He concluded that the proposals met Solicitation requirements and that DLA could reasonably expect both companies "will successfully perform the required effort." (AR, Tab 38 at 1298; *see also* Tab 39 at 1306.) However, the CO's cursory review was deficient in many respects: First, re-reviewing the proposals would not uncover new internal contradictions or produce an admission of falsity. Second, the CO's proposal comparison failed to reconcile conflicts between proposals, namely that both companies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Compare* AR, Tab 19 at 524–25 *with* Tab 21 at 825–26.) To reiterate, this simply cannot be true. The falsity is apparent on the face of the proposals. Third, the proposals contain ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(*Compare* AR, Tab 19 at 542–51 *with* Tab 21 at 836–46.) The contracting officer's linear proposal review should have identified this overlap and followed up with further meaningful inquiry. And fourth, the proposals include ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Compare* AR,

Tab 19 at 529–30 *with* Tab 21 at 828, 830.) These similarities substantiate RCI's reports that

Shanica and Hawax do not have the transportation assets to support required fuel deliveries and that the companies are at least affiliated (if not alter egos).

The contracting officer vaguely alluded to the ████████████████, stating that he ████████████████████████████████████████ leading him to ask both companies whether they were aware of any similarities with that of another offeror and if so, to explain. (AR, Tab 38 at 1304; *see also* Tab 39 at 1312.) Unsurprisingly, Shanica and Hawax declined to self-incriminate and disclaimed any knowledge of similarities. (AR, Tab 35 at 1288; Tab 36 at 1291.) Hawax, though, proffered a vague disclaimer: ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(AR, Tab 36 at 1291.) The contracting officer concluded these responses offered "a reasonable explanation for similarities," further noting that "[s]uch similarity does not establish something improper or illegal occurred." (AR, Tab 38 at 1304; *see also* Tab 39 at 1312.)

Not only is there a glaring absence of meaningful consideration in this assessment, but the contracting officer also does not elaborate on the nature or extent of any similarities. Rather, the contracting officer unquestioningly and uncritically accepted categorical denials from Shanica and Hawax. This was not rational. More than ████████████████████████████████████

████████████████████████████████████████████████████

into the proposal of another ostensibly independent offeror without coordination.

Lastly, the contracting officer asked Shanica and Hawax to each confirm a series of items regarding their respective proposal submissions, specifically:

- the accuracy of the proposed fuel sources;
- that fuel will not be obtained from prohibited sources (i.e., Iran, Russia);

████████████████████████████████████

- that it complied with all applicable laws and regulations in securing licenses and authorizations to supply fuel in Erbil, including limitations on kickbacks and provisions relating to procurement integrity;
- that ███████████████████████████████████████████████
  ████████ ";
- whether the company knows "if any affiliate . . . submitted an offer under the subject solicitation . . . and whether there was any coordination regarding proposal content";
- that it did not have any knowledge of any other offeror's prices when submitting their proposals; and
- whether it is "aware of any similarities between its proposal and that of any other offeror[.]"

(AR, Tab 39 at 1307–1309; *see also* Tab 38 at 1299–1300.)

Again, neither Awardee provided self-incriminating responses, choosing instead to stand behind their proposals. Despite the red flags partially alluded to in these questions, the contracting officer did not further investigate or probe the veracity of the proposal representations. Instead, the contracting officer accepted at face value Shanica and Hawax's "confirmations" of their prior proposal representations. Stated differently, the Agency asked companies accused of making false statements whether they made false statements, and then unquestioningly accepted their word when they denied the charges. The contracting officer's investigation was thus arbitrary and capricious.

> **3.    The Agency should have conducted further investigation beyond simply asking the Awardees to confirm that their proposal representations were not false.**

Even wearing rose-colored glasses, the contracting officer's investigation, at best, raised more questions rather than answers. For example, how is it possible that two offerors can both

████████████████████████████████████████████████████? Or

how can the same offerors affirm that they have no knowledge of any similarities in their proposals

despite ████████████████████████████████████████████? And

finally, did Shanica and Hawax coordinate to divide the market? ████████████████████

40

████████████████████████████████████████████

██████████████████, and Hawax's prices were lower than Shanica's on each of the remaining CLINs 14–17, did the companies coordinate in submitting pricing?

The inadequate investigation here is akin to the one discussed in *Oak Grove Techs.*, 155 Fed. Cl. at 114–20. There, the court found that the agency failed to sufficiently investigate allegations of a procurement official's improper conduct. *Id.* at 114. The protester alleged that the official improperly influenced the procurement in favor of another company. *Id.* In its investigation, the agency reviewed written statements from four individuals involved in the evaluation process and conducted two in-person interviews. *Id.* at 116. All four individuals categorically denied that they knew anything that would lead them to believe the official influenced the award in favor of a particular company. *Id.* The official also issued "similar blanket denials." *Id.* Relevant here, however, the agency did not follow up with the awardees' two former employees who raised the allegations. The court noted the agency's efforts were "certainly the start of a reasonable investigation" but that "the [a]gency summarily closed the investigation, reflecting a lack of curiosity that could only be described as ostrich-like." *Id.* Since the matter effectively boiled down to a credibility determination involving two irreconcilable versions of the facts, the court concluded that "the failure to do more was insufficient" and "undermines the integrity of the procurement process and the award decision." *Id.* at 116, 119.

So too here, the Agency's failure to meaningfully investigate and reconcile contradictory facts is wholly insufficient and raises doubts about the integrity of the procurement. Like in *Oak Grove*, Shanica and Hawax categorically denied any improper conduct and confirmed the accuracy of their proposals. The contracting officer similarly failed to follow up with third parties regarding the serious allegations, *e.g.*, RCI personnel, employees of either company, the refineries, etc. Likewise, DLA summarily closed the investigation prematurely, and the contracting officer took

no further action to investigate whether Shanica and Hawax misrepresented their source of fuel and transportation plans or whether they had colluded in the preparation of their proposals. Arguably, DLA here did even less than the agency in *Oak Grove*, since there, the agency engaged parties *other than* the official under investigation and further, conducted two *in-person* interviews. DLA's failure to do more here runs counter to the evidence in the record and is patently irrational. *See Banknote*, 365 F.3d at 1351.

RCI's reports of improprieties—in combination with the conspicuous similarities in the proposals—provided more than enough evidence to warrant further investigation. DLA, however, irrationally closed the file based solely on self-serving denials. The Agency should have gone beyond Shanica's and Hawax's representations and actually investigated the awardees' fuel sources, transportation assets, and collusion.

This perfunctory investigation cannot pass muster under this Court's arbitrary and capricious standard of review. Absent judicial remedy, Shanica and Hawax would unfairly benefit from unscrupulous conduct that undermines the integrity and fairness of the procurement process. The inadequate investigation was also deeply prejudicial to RCI, the only remaining technically acceptable offeror. Had the contracting officer reasonably investigated these improprieties, there is a realistic likelihood Shanica and Hawax would have been ineligible for award, leaving RCI with a substantial chance of receiving a contract award for all CLINs.

### E. The Contracting Officer's Responsibility Determinations for Shanica and Hawax Are Arbitrary, Capricious, and Otherwise Contrary to Law.

The contracting officer irrationally found Shanica and Hawax to be responsible offerors, relying almost entirely upon the self-serving representations while disregarding the conspicuous similarities discussed above. AR, Tab 38 at 1297–1304; Tab 39 at 1305–1313. Stated differently, the CO never independently investigated the credible allegations that call into question the present

responsibility of Shanica and Hawax. The CO's failure in this regard runs afoul of the discretion afforded to contracting officers in making responsibility determinations and is particularly troubling in light of the fact that Shanica's and Hawax's business ethics and integrity are squarely at issue given reports of collusion and material misrepresentation. The CO's responsibility determinations as to Shanica and Hawax are, therefore, plainly irrational, and contrary to law.

It is well-settled that a government contract may only be awarded to responsible offerors. 48 C.F.R. § 9.103(a); *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002). Before awarding any contract, "the contracting officer makes an affirmative determination of responsibility," and in "the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility." 48 C.F.R. § 9.103(b). "To find a prospective awardee responsible, the [c]ontracting [o]fficer must find that the bidder has adequate financial resources; adequate management, experience, and productive capacity to perform; and a satisfactory record of performance, ethics, and integrity." *Mark Dunning Indus., Inc. v. United States*, 142 Fed. Cl. 734, 752 (2019), *aff'd*, 826 F. App'x 925 (Fed. Cir. 2020) (citing FAR § 9.104-1).

Generally, a contracting officer has wide discretion in the determination, including as to the amount of information required. *Impresa Construzioni*, 238 F.3d at 1334–35. However, that discretion is not absolute and must be exercised reasonably and in accordance with law and regulation. *Id.* at 1335; *Mark Dunning Indus.*, 142 Fed. Cl. at 752. And where a material misrepresentation is made, as here, "[i]t is well-established that a contracting officer should consider disqualifying a proposed contractor." *Impresa Construzioni*, 238 F.3d at 1339.

1. **The contracting officer misapplied the governing standard regarding responsibility determinations.**

The record reveals that the contracting officer misapplied the governing standard on responsibility determinations. The contracting officer is required to make an "affirmative" determination of responsibility. Accordingly, in the absence of information "clearly indicating" that the prospective contractor is responsible, the contracting officer is obligated to find an offeror nonresponsible. 48 C.F.R. § 9.103(b).

Here, however, DLA flips the burden on its head. The responsibility determination memoranda never actually make an affirmative determination of responsibility, instead finding that the "similarity among proposals *is not a sufficient basis on which to determine Shanica [and Hawax] nonresponsible*." (AR, Tab 38 at 1304; *see also* Tab 39 at 1312.) In other words, the contracting officer found that the existing concerns did not rise to the level of non-responsibility, but this was no affirmative clean bill of health. As discussed above, however, the FAR requires that in "the absence of information *clearly indicating* that the prospective contractor is responsible, the contracting officer *shall* make a determination of nonresponsibility." 48 C.F.R. § 9.103(b). Because the contracting officer was unable to make an affirmative responsibility determination based on the information available regarding the suspect similarities, he should have either sought more information or found Shanica and Hawax nonresponsible. Finding the companies responsible notwithstanding the partially understood concerns was contrary to applicable law.

2. **The contracting officer failed to follow additional responsibility requirements.**

The contracting officer also failed to consider whether the awardees were responsible in accordance with the FAR's specific requirements. The FAR mandates that a contractor possesses

certain characteristics to be deemed responsible. As relevant here, "[t]o be deemed responsible, a prospective contractor **must**:"

- (b) "[b]e able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments";
- (c) "[h]ave a satisfactory performance record";
- (f) "[h]ave the necessary production, construction, and technical equipment and facilities, or the ability to obtain them."

FAR 9.104–1.

However, the contracting officer did not consider whether Shanica and Hawax could comply with the required or proposed delivery or performance schedule. FAR 9.104–1(b). Nor did the contracting officer consider whether Shanica and Hawax had access to the necessary technical equipment and facilities to perform. FAR 9.104–1(f). These required determinations are implicated by the facts present here, namely: (i) RCI's credible reports that both companies rely on prohibited Iranian fuel and lack the required transportation assets; (ii) ███████████ ██████████████████████████████████████████████████████████; and (iii) contradictory claims to ████████████████████████████████████. The contracting officer's failure to meaningfully investigate these circumstances renders its responsibility determination arbitrary and capricious and contrary to regulation.

Relatedly, the contracting officer failed to meaningfully consider whether Shanica and Hawax have a satisfactory record of integrity and business ethics. FAR 9.104–1(c). The red flags in this procurement (*e.g.*, material misrepresentations, *quid pro quo* arrangements, conspicuous proposal similarities, improper collusion, and reaffirmations of misrepresentations), raise serious concerns about Shanica and Hawax's integrity and business ethics, yet the contracting officer failed to appreciate the improprieties threating the fairness of the procurement. As such, the responsibility determinations are contrary to regulation and cannot stand.

45

████████████████████████████████

3. **The contracting officer arbitrarily failed to further investigate Shanica and Hawax's suspect confirmations.**

For all the reasons discussed *supra* Section V.D., the contracting officer's failure to reasonably investigate the many improprieties in this procurement is an independent basis to determine that the responsibility determination is contrary to regulation and unsupportable.

As a final note, the contracting officer also failed to reasonably investigate Hawax's and Shanica's suspect affirmations that they prepared their pricing proposals independently and did not have affiliates competing under the Solicitation. *See* 48 C.F.R. § 52.203-2. (AR, Tab 38 at 1300; Tab 39 at 1309.) Shanica and Hawax submitted pricing consistent with an apparent coordinated arrangement to divide the CLINs between each other: ███████████████████ ██████████, while each of Hawax's prices for CLINs 14–17 was lower than Shanica's. Given the totality of the concerning facts revealed to date, this cannot be rationally waived away as mere coincidence.

At bottom, DLA's irrational responsibility determinations are prejudicial to RCI. But for deeming Shanica and Hawax responsible offerors, neither company would be eligible for award, and RCI would have a substantial chance of receiving a contract award for all CLINs.

## VI. PREJUDICE

RCI is prejudiced by the procurement errors identified above, individually and collectively. The administrative record confirms that DLA found RCI to be an eligible and technically acceptable offeror with respect to all of the Iraq and Syria CLINs that were improperly awarded to Hawax and Shanica. (AR, Tab 24 at 883-85, 888, 893-94.) But for any one of the procurement errors established here, RCI undoubtedly has a substantial chance of receiving a contract award covering at least one of the CLINS awarded to Hawax or the thirteen all-or-nothing CLINs

awarded to Shanica. *See Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1359–60 (Fed. Cir. 2015); *IAP Worldwide Servs.*, 160 Fed. Cl. at 87–89.

If this Court agrees that the Shanica and Hawax proposals contain material misrepresentations or are technically deficient due to the false letters of commitment, then RCI is left as the only technically acceptable offeror for all CLINs under the Solicitation. *See Alaska Structures*, 144 Fed. Cl. at 84 (material misrepresentation generally results in exclusion from competition); *Golden IT*, 157 Fed Cl. at 701 (discussing same); *WaveLink*, 154 Fed. Cl. at 283 (finding prejudice from waiver of material solicitation requirement).

And if the Court agrees that DLA was irrational in its approach to its corrective action investigation, responsibility determinations, or price realism determination, each of those errors on its own is prejudicial. But for any one of those errors, there is a realistic possibility that Hawax, Shanica, or both would be deemed ineligible for award—leaving RCI as the only offeror eligible for award, or at least requiring DLA to reopen the competition. Even when there is "much speculation" as to how an agency might approach corrective action, the test is whether there is a "realistic possibility" that the agency's corrective action will leave the protester with a substantial chance of award. *Tinton Falls*, 800 F.3d at 1359–60 ("And although there is much speculation as to whether [the agency] would rebid the solicitation on an unrestricted basis—thus allowing Tinton Falls to compete for the contract—none of the parties disputes the Claims Court's finding that this is at least a realistic possibility.") RCI plainly meets that standard here.

## VII.    REMEDY

Once bid protest jurisdiction attaches, this Court has broad statutory authority to "award any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C.

§ 1491(b)(2), *see Turner Constr. Co.*, *v. United States*, 645 F.3d 1377, 1387–88 (Fed. Cir. 2011). A combination of inter-related forms of relief are necessary and appropriate here.

**First**, because DLA's awards to Shanica and Hawax, including its corrective action investigation, are irrational, unlawful, and based on material proposal misrepresentations—this Court should issue declaratory relief confirming the same. *See IAP Worldwide*, 160 Fed. Cl. at 70–71 (discussing significance of declaratory relief in bid protests).

**Second**, the Court should also vacate the contract awards to Shanica and Hawax, along with the flawed results of the contracting officer's irrational corrective action investigation: "*the ordinary practice is to vacate arbitrary and capricious agency action.*" *IAP Worldwide*, 160 Fed. Cl. at 68 (internal quotation marks omitted); *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020) ("Vacatur is the normal remedy when we are faced with unsustainable agency action.") (internal quotation marks omitted).

**Third**, the Court should permanently enjoin DLA from proceeding with performance of the awards to Hawax and Shanica and remand this matter back to DLA to rectify the procurement. To the extent the Court finds that the Shanica and Hawax proposals contain material misrepresentations, the injunction and remand order should instruct DLA to eliminate Shanica and Hawax from the competition. *See IAP Worldwide*, 160 Fed. Cl. at 74–78 (recognizing possibility of remand with instructions); *Alaska Structures*, 144 Fed. Cl. at 84 (material misrepresentation generally results in exclusion from competition); *Golden IT*, 157 Fed Cl. at 701 (discussing same). At a minimum, if the Court is not able to conclude that a material misrepresentation exists, the Court should direct DLA on remand to investigate the apparent proposal misrepresentations and, if confirmed, direct DLA to eliminate the offending proposal(s).[14]

---

[14] Alternatively, as discussed above, RCI seeks leave to conduct limited discovery to develop

The equities in this case fully support the remedy described above. Where a plaintiff succeeds on the merits, an injunction is appropriate where: the plaintiff "will suffer irreparable harm" absent injunctive relief, "the balance of hardships to the respective parties favors the grant of injunctive relief," and "the public interest is served by a grant of injunctive relief." *Centech Grp., Inc.*, 554 F.3d at 1037.

The irreparable harm to RCI is the lost opportunity to compete fairly for the full scope of the DLA's requirements under the Solicitation. *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 34 (this Court "has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract…. That concept stretches back more than two decades." (cleaned up).), *on recon. in part*, 161 Fed. Cl. 110 (2022).

The public interest favors an injunction here, as the "public also has a strong interest in preserving the integrity of the procurement process." *Medline Indus., Inc v. United States*, 155 Fed. Cl. 522, 540 (2021) (quotation marks omitted). There are no extraordinary national security or other concerns present to disturb this Court's longstanding recognition that the "public interest always favors the correct application of law, and more particularly, in the context of procurement statutes, the public interest always favors open and fair competition, and to that end, agency compliance with applicable regulations." *Seventh Dimension*, 160 Fed. Cl. at 35 (cleaned up). The public interest also weighs heavily in favor of ensuring that taxpayer dollars are not used to purchase Iranian fuel, contrary to regulation and U.S. foreign policy.

The risk of harm to RCI and the public interest outweighs any potential counterbalancing harm to DLA, Hawax, or Shanica. Shanica and Hawax have not even bothered to intervene to protect any interest they may have in the flawed contract awards. At most, DLA can complain of

---

additional factual support relevant to the material misrepresentation claims.

further delay in transitioning to new contracts, but DLA is already obtaining the fuel deliveries it requires, and any complaint of delay "is unconvincing because the delay and administrative burdens associated with stopping performance under the current award and requiring the agency to take curative actions are problems of the government's own making." *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 332 (2024).

## VIII. CONCLUSION

For the foregoing reasons, RCI respectfully requests that this Court grant RCI's Motion for Judgment on the Administrative Record.

Dated: May 24, 2024

*Of Counsel*

David B. Robbins
Noah B. Bleicher
Nathaniel E. Castellano
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

Respectfully submitted,

/s/ *Moshe B. Broder*
Moshe B. Broder (Counsel of Record)
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
(202) 637-6334
mbroder@jenner.com

*Counsel to Repeat Consultants International, LLC*