**REDACTED VERSION**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

24-619C
(Judge Davis)

REPEAT CONSULTANTS INTERNATIONAL, LLC,

Plaintiff,

v.

UNITED STATES,

Defendant,

## DEFENDANT'S PARTIAL MOTION TO DISMISS, CROSS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, AND RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

DOUGLAS MICKLE
Assistant Director

OF COUNSEL

STEVEN SOSKO
Senior Counsel
Defense Logistics Agency Counsel-Energy

RICHARD AVILES
Senior Counsel
Defense Logistics Agency Counsel-Energy

EMMA E. BOND
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-2034
Emma.E.Bond@usdoj.gov

June 7, 2024                                    *Attorneys for Defendant*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................................iv

INTRODUCTION ..................................................................................................................1

STATEMENT OF THE ISSUES ...........................................................................................2

STATEMENT OF THE CASE ..............................................................................................2

I.    Nature Of The Case.........................................................................................2

II.    Statement Of The Facts .................................................................................3

    A.    Department Of Defense Operations In Syria And Erbil, Iraq, Require Jet Fuel, Diesel Fuel, and Gasoline ..............................................3

    B.    In April 2023, DLA Energy Issues A Solicitation For Fuel Supply And Delivery To Erbil, Iraq, and Syria...........................................4

    C.    Offerors Are Evaluated Based On Technical Capability, Past Performance, And Price, With Award Made To The Lowest-Priced, Technically Acceptable Offeror ...................................................5

        1.    Gateway Criteria ...........................................................5

        2.    Technical Acceptability ................................................6

        3.    Past Performance ..........................................................7

        4.    Price ..............................................................................7

    D.    DLA Awards Contracts To Shanica, RCI, and Hawax on October 23, 2023 ...........................................................................7

    E.    DLA Takes Corrective Action After RCI Raises Allegations Of A Violation Of The Procurement Integrity Act ..............................8

    F.    DLA Reaffirms The Original Award Decisions—Rejecting RCI's Allegations Regarding Procurement Integrity, Iranian Fuel, Affiliation, And Price Realism....................................................9

    G.    RCI Files A Second Protest With GAO ................................11

H.    At This Court's Request, GAO Issues An Advisory Opinion ................ 12

I.    RCI Is Unable To Perform Its Current Contract In Syria ........................ 13

SUMMARY OF ARGUMENT ...................................................................................... 13

ARGUMENT ................................................................................................................ 15

I.    Legal Standards ................................................................................... 15

      A.    Standard Of Review For 12(b)(1) Motion To Dismiss ............................ 15

      B.    Standard Of Review For Bid Protests ...................................................... 15

II.   RCI's Challenge To The Contract Award To Shanica For CLINs 1-13 Is Moot
      Because RCI Cannot Make Deliveries To Syria ................................................. 16

      A.    A Protest Is Moot When The Court Is Unable To Remedy The Alleged
            Injury And The Parties Lack A Cognizable Interest In The Outcome Of
            The Case ................................................................................................... 17

      B.    RCI Can No Longer Make Deliveries To Locations In Syria, Mooting Its
            Challenge To The Award To Shanica For CLINs 1-13 ........................... 18

III.  DLA Rationally Awarded Contracts To Shanica And Hawax When They Were
      The Lowest-Priced, Technically Acceptable Offerors For CLINs 1-13 and 15-17,
      Respectively ...................................................................................................... 19

      A.    DLA Rationally Rated Shanica And Hawax As Technically Acceptable .....
            ................................................................................................................. 19

            1.    The GAO Correctly Rejected RCI's Related Challenge To The
                  Agency's Technical Evaluation, Explaining That The Agency's
                  Evaluation Was Rational ............................................................. 22

            2.    The Source Selection Authority Was Not Required To Find That
                  The Use Of The Word "████████" Meant That The Supply Letters
                  Of Commitment Were False ........................................................ 23

            3.    RCI's Technical Arguments Are Similarly Unpersuasive .......... 27

            4.    Discovery Is Not Appropriate ..................................................... 28

      B.    DLA's Price Realism Analysis Was Rational ......................................... 31

1.    DLA Rationally Determined That The Price Offered By Shanica For CLINs 1-13 Was Realistic ......................................................32

2.    DLA Rationally Determined That The Price Offered By Hawax For CLINs 15-17 Was Realistic ....................................................34

3.    RCI's Arguments Regarding The Price Differential Merely Second Guess DLA's Reasonable Assessment ..........................................39

4.    The GAO's Analysis Is Instructive ..............................................40

5.    RCI's Remaining Arguments Are Unpersuasive .........................41

C.    DLA Rationally Found Hawax And Shanica To Be Responsible ........... 41

1.    Contracting Officers Have Significant Discretion In Making Responsibility Determinations ....................................................42

2.    The Contracting Officer Did Not Abuse His Discretion In Finding Shanica And Hawax Responsible .................................. 42

E.    RCI Provides No Basis For Second Guessing DLA's Corrective Action. 47

F.    RCI Fails To Demonstrate Prejudice ........................................................51

IV.    RCI Is Not Entitled To The Remedies It Seeks ....................................52

CONCLUSION....................................................................................................... 55

## TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*Ackerman Bros. Farms, LLC v. USDA,*
    2021 WL 6133910 (E.D. Mich. Dec. 29, 2021)............................................................57

*Acrow Corp. of Am. v. United States,*
    97 Fed. Cl. 161 (2011).........................................................................................49

*Active Network, LLC v. United States,*
    130 Fed. Cl. 421 (2017).......................................................................................39

*Advanced Data Concepts, Inc. v. United States,*
    216 F.3d 1054 (Fed. Cir. 2000)......................................................................15, 19

*Afghan Am. Army Servs. Corp. v. United States,*
    90 Fed.Cl. 341 (2009).................................................................................32, 34, 40

*AgustaWestland N.A., Inc. v. United States,*
    880 F.3d 1326 (Fed. Cir. 2018).....................................................................28, 29

*Ala. Aircraft Indus., Inc.-Birmingham v. United States,*
    586 F.3d 1372 (Fed. Cir. 2009)..................................................................16, 32, 40

*Alaska Structures, Inc. v. United States,*
    144 Fed. Cl. 80 (2019).........................................................................................28

*Alfa Laval Separation, Inc. v. United States,*
    175 F.3d 1365 (Fed. Cir. 1999).....................................................................34, 53

*Allied Tech. Grp., Inc. v. United States,*
    649 F.3d 1320 (Fed. Cir. 2011).....................................................................50, 53

*Amoco Prod. Co. v. Vill. of Gambell, Ak.,*
    480 U.S. 531 (1987) ..........................................................................................54

*Anderson v. United States,*
    344 F.3d 1343 (Fed. Cir. 2003)..........................................................................17

*Axiom Res. Mgmt., Inc. v. United States,*
    564 F.3d 1374 (Fed. Cir. 2009)....................................................... 15, 16, 28, 49

*Bannum, Inc. v. United States,*
    404 F.3d 1346 (Fed. Cir. 2005).......................................................... 15, 16, 53

*Bender Shipbuilding & Repair Co. v. United States,*
   297 F.3d 1358 (Fed. Cir. 2002) ........................................................... 43, 44, 49

*Blue & Gold Fleet, LP v. United States,*
   70 Fed. Cl. 487 (2006) ................................................................................ 23

*CACI, Inc.-Fed. v. United States,*
   67 F.4th 1145 (Fed. Cir. 2023) ................................................................... 38

*CACI, Inc.–Federal v. United States,*
   719 F.2d 1567 (Fed. Cir. 1983) .................................................................. 16

*Camp v. Pitts,*
   411 U.S. 138 (1973) .................................................................................... 28

*CBY Design Builders v. United States,*
   105 Fed. Cl. 303 (2012) .............................................................................. 22

*Centech Group, Inc. v. United States,*
   554 F.3d 1029, 1039 (Fed. Cir. 2009) ........................................................ 50

*Ceres Environmental Serices, Inc.v. United States,*
   97 Fed. Cl. 277 (2011) ........................................................................... 32, 40

*Chapman Law Firm Co. v. United States,*
   490 F.3d 934 (Fed. Cir. 2007) ............................................................... 18, 19

*Citizens Against Ruining Our Env't v. Bernhardt,*
   923 F.3d 831 (10th Cir. 2019) .................................................................... 57

*Confidential Informant 59-05071 v. United States,*
   134 Fed. Cl. 698 (2017) .............................................................................. 49

*Connected Glob. Sols., LLC v. United States,*
   159 Fed. Cl. 801 (2022) ......................................................................... 23, 26

*CRAssociates, Inc. v. United States,*
   95 Fed. Cl. 357 (2010) ................................................................................ 16

*CRAssociates, Inc. v. United States,*
   103 Fed. Cl. 23 (2012) ................................................................................ 55

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) .................................................................................... 17

*DeFunis v. Odegaard*,
    416 U.S. 312 (1974) ...................................................................................17

*DigiFlight, Inc. v. United States*,
    165 Fed. Cl. 588 (2023) .............................................................. 33, 34, 35, 39

*E.W. Bliss Co. v. United States*,
    77 F.3d 445 (Fed. Cir. 1996) ................................................................20, 27

*Emery Worldwide Airlines, Inc. v. United States*,
    264 F.3d 1071 (Fed. Cir. 2001) ............................................................16, 45

*Flast v. Cohen*,
    392 U.S. 83 (1968) .....................................................................................17

*Galen Med. Assocs., Inc. v. United States*,
    369 F.3d 1324 (Fed. Cir. 2004) ............................................................32, 40

*Golden IT, LLC v. United States*,
    157 Fed. Cl. 680 (2022) .............................................................................28

*Harmonia Holdings Group, LLC v. United States*,
    999 F.3d 1397 (Fed. Cir. 2021) ...................................................................51

*Health Net Fed. Services, LLC v. United States*,
    169 Fed. Cl. 738 (2024) .............................................................................51

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...................................................................................49

*Holley v. United States*,
    124 F.3d 1462 (Fed. Cir. 1997) ...................................................................15

*IAP Worldwide Servs. v. United States*,
    160 Fed. Cl. 57 (2022) ..........................................................................56, 57

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
    238 F.3d 1324 (Fed. Cir. 2001) .............................................................passim

*Indium Corp. of America v. Semi-Alloys, Inc.*,
    781 F.2d 879 (Fed. Cir. 1985) ....................................................................15

*J.E. McAmis, Inc. v. United States*,
    164 Fed. Cl. 650 (2023) .............................................................................55

*John C. Grimberg Co. v. United States*,
  185 F.3d 1297 (Fed. Cir. 1999)................................................... 43, 44, 46, 52

*Keco Indus., Inc. V. United States*,
  492 F.2d 1200 (Fed. Cir. 1974)....................................................................44

*Konecranes Nuclear Equip. & Services, LLC v. United States*,
  165 Fed. Cl. 421 (2023)................................................................................46

*L–3 Commc'ns EOTech, Inc. v. United States*,
  87 Fed.Cl. 656 (2009)...................................................................................20

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
  91 Fed. Cl. 347 (2010).................................................................................28

*Lewis v. United* States,
  70 F.3d 597 (Fed. Cir. 1995)........................................................................49

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................18

*eBay, Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ....................................................................................55

*Mil-Mar Cent. Corp. v. United States*,
  111 Fed. Cl. 508 (2013) ........................................................................passim

*Monsanto Co. v. Geertson Seeds Farm*,
  130 S. Ct. 2743 (2010).................................................................................55

*Motor Vehicle Mfrs. Ass'n  v. State Farm*,
  463 U.S. 29 (1983) ......................................................................................16

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans*,
  *Affs.*, 260 F.3d 1365 (Fed. Cir. 2001) .........................................................57

*NKF Eng'g, Inc. v. United States*,
  805 F.2d 372 (Fed. Cir. 1986).......................................................................50

*Oak Grove Techs., LLC v. United Sates*,
  155 Fed. Cl. 84 (2021).................................................................................50

*Omran Holding Group v. United States*,
  128 Fed. Cl. 273 (2016) ........................................................... 5, 8, 12, 16

*One Largo, Metro, LLC v. United States*,
  109 Fed. Cl. 39 (2013) ................................................................................. 20

*Orion Int'l Techs. v. United States*,
  66 Fed. Cl. 569 (2005) ................................................................................. 22

*Orion Int'l Techs. v. United States*,
  60 Fed. Cl. 338 (2004) ................................................................................. 30

*PAI Corp. v. United States*,
  614 F.3d 1347 (Fed. Cir. 2010) .............................................................. 15, 19

*PGBA, LLC v. United States*,
  60 Fed. Cl. 196 (2004) ................................................................................. 55

*PGBA, LLC v. United States*,
  389 F.3d 1219 (Fed. Cir. 2004) .............................................. 54, 55, 56, 57

*PPATHI, Inc.*,
  B–249182.4, 1993 WL 25128 (Comp. Gen. Jan. 26, 1993) ........................... 29

*Prasco, LLC v. Medicis Pharm. Corp.*,
  537 F.3d 1329 (Fed. Cir. 2008) .................................................................... 17

*Precision Asset Mgt. Corp. v. United States*,
  125 Fed. Cl. 228 (2016) ............................................................................... 54

*Samuels v. Mackell*,
  401 U.S. 66 (1971) ....................................................................................... 56

*Sealift, Inc. v. United States*,
  82 Fed. Cl. 527 (2008) ................................................................................. 23

*Seventh Dimension, LLC v. United States*,
  160 Fed. Cl. 1 (2022) ................................................................................... 55

*Statistica, Inc. v. Christopher*,
  102 F.3d 1577 (Fed. Cir. 1996) .................................................................... 53

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ..................................................................................... 17

*Trilon Educational Corp. v. United States*,
  217 Ct. Cl. 266, 578 F.2d 1356 (1978) ......................................................... 44

*Tucson Mobilephone, Inc.*,
 B–258408.3, 1995 WL 335101 (Comp. Gen. June 5, 1995) ............................................29

*Tyler Const. Group v. United States*,
 570 F.3d 1329, 1334 (Fed. Cir. 2009) .......................................................29, 38

*United States Parole Comm'n v. Geraghty*,
 445 U.S. 388 (1980) ...........................................................................18, 19

*Univ. Research Co. v. United States*,
 65 Fed. Cl. 500 (2005)..................................................................................22

*Waste Mgt. LLC v. United States*,
 169 Fed. Cl. 239 (2024) ..............................................................................17

*Weeks Marine, Inc. v. United States*,
 575 F.3d 1352 (Fed. Cir. 2009)...................................................................17

*WellPoint Military Care Corp. v. United States*,
 953 F.3d 1373 (Fed. Cir. 2020) ....................................................................34

## <u>STATUTES</u>

5 U.S.C. § 706.............................................................................................passim

5 U.S.C. § 706(2)(A) ........................................................................................15

28 U.S.C. § 1491(b) ..........................................................................................57

28 U.S.C. § 1491(b)(3)..................................................................................31, 41

28 U.S.C. § 1491(b)(4).................................................................................passim

41 U.S.C. § 2102(a)(1).......................................................................................52

41 U.S.C. §§ 2101–2107 ...................................................................................52

## <u>RULES</u>

RCFC 12(b)(1)............................................................................................3, 15

RCFC 12(h) ......................................................................................................15

## REGULATIONS

22 C.F.R. § 92.66(b)..................................................................................................31

48 C.F.R. § 3.101-1..................................................................................................50

48 C.F.R. § 9.103(a)................................................................................................43

48 C.F.R. § 9.104-3..................................................................................................48

48 C.F.R. § 9.104–1(b)............................................................................................46

48 C.F.R. § 15.101–2(a)............................................................................................5

48 C.F.R. § 15.101–2(b)(1).......................................................................................5

## OTHER AUTHORITIES

Restatement (Fourth) Foreign Relations Law of the United States § 432 (Am. Law Inst. 2018).30

Black's Law Dictionary (11th ed. 2019) ...................................................................25

Preparation of Letters Rogatory, U.S. Dep't of State,
    https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-
    asst/obtaining-evidence/Preparation-Letters-Rogatory.html (last accessed on June 7,
    2024) ...............................................................................................................31

## INTRODUCTION

Pursuant to Rules 12(b)(1) and 52.1(c), of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss-in-part the protest filed by plaintiff, Repeat Consultants International, LLC (RCI), otherwise deny RCI's motion for judgment on the administrative record, and grant the defendant's cross motion.

This case involves a Defense Logistics Agency (DLA) procurement for fuel supply and delivery services in Syria and Erbil, Iraq, evaluated on a lowest-priced, technically acceptable basis. DLA awarded contracts for contract line item numbers (CLINs)[1] 1-13 and 15-17 to the lowest-priced, technically acceptable offerors, Shanica Company (Shanica) and Hawax Corporation (Hawax), respectively. RCI then filed multiple protests—culminating in the protest before this Court—claiming that it is the only technically acceptable and responsible offeror for all CLINs, and thus should have received all awards, despite its higher prices.

As a threshold matter, RCI's challenge to the contract award to Shanica for fuel deliveries to Syria (CLINs 1-13) should be dismissed as moot, because there is no remaining case or controversy. Since filing the case, RCI has been denied access past the Syrian border and thus is unable to deliver fuel to Syria for DLA under its current, short-term contract. Because RCI is unable to perform in Syria, it is ineligible for award and there is no remaining remedy that the Court could award for CLINs 1-13—rendering the dispute academic.

With regard to the contract award to Hawax for CLINs 15-17 in Erbil, Iraq—and to the extent the Court reaches the merits of RCI's challenge to the Shanica award for CLINs 1-13— DLA's decision should be affirmed and RCI's protest should be denied on the merits. DLA

---

[1] For ease of reference, CLINs refers to the solicitation line item numbers rather than the CLINs in the award contracts.

rationally rejected a string of unsupported allegations that RCI made against Shanica and Hawax, and RCI's protest merely second guesses DLA's reasonable investigation and findings. Contrary to RCI's arguments, DLA rationally found Shanica and Hawax to be both technically acceptable and responsible, and found their prices—which were lower than, but in the same ballpark as RCI's prices—to be realistic.

## STATEMENT OF THE ISSUES

1.    Whether RCI's claims challenging the contract award to Shanica for fuel deliveries in Syria are moot, when RCI is unable to make fuel deliveries to Syria.

2.    Whether DLA rationally awarded contracts to Shanica and Hawax when they were the lowest-priced, technically acceptable offerors for the relevant CLINs.

    A.    Whether DLA rationally found Shanica's and Hawax's proposals were technically acceptable and whether RCI has failed to demonstrate any material misrepresentation in those proposals.

    B.    Whether DLA's price realism evaluation was rational.

    C.    Whether DLA rationally found Shanica and Hawax to be responsible.

    D.    Whether RCI has failed to establish prejudice from any alleged errors.

3.    Whether RCI has failed to establish entitlement to injunctive relief.

## STATEMENT OF THE CASE

I.    Nature Of The Case

This dispute arises from a solicitation for fuel supply and delivery to locations in Syria and Erbil, Iraq, under DLA's Request for Proposals No. SPE605-23-R-0209. After reviewing all proposals, DLA awarded contracts to RCI, Shanica, and Hawax—with Shanica awarded CLINs 1-13 for deliveries to Syria; RCI awarded CLIN 14 for deliveries to Erbil, Iraq; and Hawax

awarded CLINs 15-17 for deliveries to Erbil, Iraq. Tab 24, AR 865; Tab 25, AR 895-974; Tab 26, AR 975-1041.

On November 6, 2023, RCI filed a protest at the GAO, which was dismissed following DLA's notice that it would take corrective action. Tab 31, AR 1061-1062; Tab 34, AR 1286. DLA then reconsidered its assessment of price realism, responsibility, and an alleged Procurement Integrity Act (PIA) violation. Tab 37, AR 1292-1296; Tab 38, AR 1297-1304; Tab 39, AR 1305-1313; Tab 40, AR 1314-1331. After evaluating these issues, DLA re-affirmed its decision to award to Shanica and Hawax. Tab 41, AR 1332; Tab 42, AR 1333. RCI then filed another GAO protest, alleging material misrepresentations in Shanica's and Hawax's proposals and challenging DLA's assessments regarding price realism, responsibility, and the alleged PIA violation. Tab 47, AR 1349-1350.

Thirteen days before the deadline for the GAO's decision, RCI filed another protest in this Court, resulting in dismissal of the GAO protest. Compl., ECF No. 1. This Court requested an advisory opinion from the GAO. Order, ECF No. 11. On May 9, 2024, the GAO filed its advisory opinion stating that it would have denied RCI's protest. Tab 110, AR 5565-5573.

II.    Statement Of The Facts

    A.    Department Of Defense Operations In Syria And Erbil, Iraq, Require Jet Fuel, Diesel Fuel, and Gasoline

The United States Department of Defense maintains ongoing military operations in Syria and Erbil, Iraq. Rodriguez Decl. ¶ 3.[2] A component of DLA—DLA Energy—is responsible for acquiring energy-related supplies and services to support U.S. forces and Department of Defense

_____

[2]   The declaration of Orlando Rodriguez, Sr., contracting officer for the procurement, is attached as Exhibit 1. The information in the declaration is provided only in reference to the RCFC 12(b)(1) motion to dismiss and the equitable factors for injunctive relief.

personnel in the region.  *See id.* ¶ 11.  This procurement involves the supply and delivery of jet fuel, diesel fuel, and gasoline to numerous locations in Syria and Erbil, Iraq.[3]  *See* Tab 67, AR 1724; Tab 66, AR 1709.  These energy supplies are critical to ongoing operations in the region. "Without the continued fuel support DLA provides, these operations and U.S. personnel would be at grave risk."  Rodriguez Decl. ¶ 12.

When procuring the necessary fuel supplies, DLA must navigate complex regional issues. *See. e.g.*, Rodriguez Decl. ¶ 11.  In planning for this procurement, DLA recognized the historic challenges associated with ensuring access to the Erbil Air Base and Syria—as required to perform deliveries to the relevant sites in Syria and Erbil, Iraq.  *See* Tab 67, AR 1724.  DLA explained that "unique aspects of [the] procurement" included "multiple issues as it relates to securing and maintaining access to Erbil Airforce Base (EAB) and Syria."  Tab 67, AR 1724.

B.    In April 2023, DLA Energy Issues A Solicitation For Fuel Supply And Delivery To Erbil, Iraq, and Syria

On April 27, 2023, DLA Energy posted Request for Proposals (RFP) No. SPE605-23-R-0209, a solicitation for commercial products and commercial services, to procure fuel supply and delivery to Erbil, Iraq, and Syria.  Tab 1 at AR 1, 7-12.  CLINs 1-13 supplied fuel for locations in Syria on an "all or none" basis.  In other words, contractors offering to supply fuel in Syria were evaluated for all requirements for all 13 CLINs, which were awarded as a group rather than individually.  Tab 1, AR 149.  CLINs 14-17 covered fuel needs for various locations in Erbil, Iraq, which were competed at the line-item level and were awarded on an individual basis.  Tab 1, AR 149.

---

[3] Jet fuel is also referred to as JP8; diesel fuel is referred to as SFD; and gasoline is referred to as MUM.  Tab 67, AR 1724.

C.      Offerors Are Evaluated Based On Technical Capability, Past Performance, And Price, With Award Made To The Lowest-Priced, Technically Acceptable Offeror

Offerors were evaluated on a lowest-priced, technically acceptable basis, considering three evaluation factors: technical acceptability, past performance, and price.  Tab 1, AR 2; Tab 1, AR 149.  The lowest-priced technically acceptable methodology is appropriate when the Government expects that the best value will result from the technically acceptable proposal with the lowest price.  FAR § 15.101–2(a).  Consistent with this methodology, the solicitation notified offerors that "award will be made on the basis of the lowest evaluated price of proposals meeting or exceeding the acceptability standards for non-cost factors."  Tab 1, AR 2; FAR § 15.101–2(b)(1).  Before considering the three evaluation factors, however, offerors were required to demonstrate compliance with the threshold "gateway" criteria.

1.      Gateway Criteria

DLA established three threshold gateway criteria, or preliminary evaluation factors.  Tab 1, AR 144-145.  Without meeting the applicable gateway criteria, offers would "not be further evaluated."  Tab 1, AR 144-145 (capitalization altered).  The first gateway step required that the offeror be "[f]ully registered in the Joint Contingency Contracting System (JCCS)," Tab 1, AR 144, "a vendor vetting database."  *Omran Holding Group v. United States*, 128 Fed. Cl. 273, 275 (2016).

The second gateway factor required offerors to "[d]emonstrate and provide evidence of ability to gain access into Erbil Air Base (EAB)."  Tab 1, AR 145.  Examples of acceptable evidence included documentation from the Asayish, the Kurdish security organization operating in the Kurdistan region of Iraq, including "1. An updated Asayish List with Offeror's name on it for Fuel Supply/Transportation, etc.; 2. A letter from the Asayish Defense Forces showing Offeror has access to get into EAB."  Tab 1, AR 145.

Finally, the third gateway factor required offerors to demonstrate access into the Syrian border. Tab 1, AR 145. DLA again provided examples of acceptable evidence of such access, including documentation from the entities governing the autonomous administration in northern and eastern Syria. Acceptable evidence of access included "1. An updated Company Evaluation and Monitoring Committee List with Offeror's name on it from the Autonomous Administration in Northeast Syria; 2. A letter from the Syrian Defense Council/Committee showing Offeror has access to get into Syria." Tab 1, AR 145. In a June 9, 2023 amendment, DLA clarified that the third gateway factor did not apply "to the portions of offers pertaining to CLINs 14-17," for deliveries to Erbil, Iraq. Tab 15, AR 177.[4]

### 2. Technical Acceptability

For offerors satisfying the gateway criteria, technical capability was based on three subfactors—supply, transportation, and storage / distribution. Each subfactor was evaluated with adjectival ratings of "acceptable" or "unacceptable."[5] Tab 1, AR 149-150. To demonstrate an "acceptable" rating for the supply subfactor, DLA required each offeror to submit a "supply plan" reflecting the "ability to supply all of the products listed in the estimated quantities stated in the schedule." Tab 1, AR 149 (citing Tab 1, AR 6-14). DLA also required each offeror to submit "[a] detailed description and a map or chart of the offeror's supply chain," "[a]ll [s]ource letters of commitments," and "Certificates of Quality and/or Analysis (COQ/COA), for all products" on the schedule. Tab 1, AR 149.

---

[4] The second gateway factor requiring access to Erbil, Iraq, remained necessary for CLINs 1-13 for deliveries to Syria. Offerors "must be able to access Erbil Air Base (EAB) to stage up" for the ground lines of communication (GLOC) to get into Syria. Tab 15, AR 177.

[5] An "acceptable" rating reflected that the offeror "[m]eets the minimum requirements of the solicitation." Tab 1, AR 149.

The second subfactor—transportation—required evaluation of the offeror's "ability to arrange and execute transportation to support orders placed under contract and its schedule." Tab 1, AR 149.  Finally, the third subfactor—storage/distribution—required each offeror to submit a "storage plan" reflecting its "ability to provide sufficient intermediate storage throughout the life of the contract to support daily deliveries."  Tab 1, AR 150.

    3.    Past Performance

Offerors were also rated as "acceptable" or "unacceptable" for past performance.  Tab 1, AR 150.  An "acceptable" past performance would be awarded if "[b]ased on the [o]fferor's performance record, the Government has a reasonable expectation that the [o]fferor will successfully perform the required effort, or the [o]fferor's performance record is unknown."  Tab 1, AR 150; *see also* FAR 15.305(a)(2)(iv).

    4.    Price

    The final evaluation factor was price, with the contract awarded to the technically acceptable offeror with the lowest price.  Tab 1, AR 2.  The solicitation contemplated a contract with a fixed price with economic price adjustment.  Tab 1, AR 144.  In other words, after award, the contract price for all contract line item numbers (CLINs) would escalate or de-escalate on a monthly basis, based on a given reference price.  *See* Tab 1, AR 17-18.  When evaluating price, DLA stated it would consider price realism "to determine if a low price reflects the contractor's ability to understand the inherent risk in the requirement."  Tab 1, AR 151.

    D.    DLA Awards Contracts To Shanica, RCI, and Hawax on October 23, 2023

RCI, Shanica, Hawax, and other offerors submitted final offers on June 22.  Tab 24, AR 867-868 (listing offerors).  Hawax proposed to perform ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆  RCI and Shanica proposed to perform all CLINs.  Tab 24, AR 883.  Six offerors

proceeded to evaluation on the merits after satisfying the gateway criteria for one or more CLINs.  Tab 24, AR 881-884.  Only three offerors—Hawax, Shanica, and RCI—were assessed an overall technical evaluation of "acceptable," Tab 24, AR 884, and all three also received an "acceptable" past performance rating.  Tab 24, AR 887-888.

With regard to price, Shanica proposed the lowest price for CLINs 1-13 for Syria, RCI proposed the lowest price for CLIN 14, and Hawax proposed the lowest price for CLINs 15-17. Tab 24, AR 889-892, 894.

Accordingly, on October 23, 2023, the Source Selection Authority signed the Source Selection Decision Document (SSDD), determining that Shanica represented the best overall value to the Government for CLINs 1-13, RCI represented the best overall value to the Government for CLIN 14, and Hawax represented the best overall value to the Government for CLINs 15-17.  Tab 24, AR 894.  The Source Selection Authority thus directed contract awards to Shanica, RCI, and Hawax for CLINs 1-13, 14, and 15-17, respectively.  Tab 24, AR 894.

E.    DLA Takes Corrective Action After RCI Raises Allegations Of A Violation Of The Procurement Integrity Act

On November 6, 2023, RCI filed a protest with the GAO, challenging the awards of CLINs 1-13 and 15-17 to Shanica and Hawax, respectively.  Tab 31, AR 1061-1086 (docketed as B-421772.3).  RCI raised a wide variety of allegations, including (1) that the procurement was tainted by violations of the Procurement Integrity Act, (2) that Hawax was ineligible for award, (3) that Shanica's and Hawax's proposals included material misrepresentations regarding their technical capability, (4) that DLA's price realism analysis was unreasonable, and (5) that DLA erred in finding that Shanica and Hawax were responsible.  *Id.*

DLA elected to take corrective action to investigate the Procurement Integrity Act allegations, re-evaluate price, and review the remaining protest grounds. Tab 33, AR 1284-1285. The GAO dismissed RCI's protest as moot on December 1, 2023. Tab 34, AR 1286.

      F.      DLA Reaffirms The Original Award Decisions—Rejecting RCI's Allegations
                <u>Regarding Procurement Integrity, Iranian Fuel, Affiliation, And Price Realism</u>

During corrective action, DLA investigated and rejected RCI's allegations regarding price realism, Tab 37, AR 1292-1296, the responsibility of Hawax and Shanica, Tab 38, AR 1297-1304; Tab 39, AR 1305-1313, and alleged violations of the Procurement Integrity Act, Tab 40, AR 1314-1331. After considering each of these issues, the Source Selection Authority reaffirmed the original decision to award CLINs 1-13 to Shanica, CLIN 14 to RCI, and CLINs 15-17 to Hawax. Tab 41, AR 1332; Tab 42, AR 1333.

By this point, DLA had received three different letters from RCI raising a series of allegations. The first letter claimed that RCI's ▆▆▆▆▆▆▆▆ "heard from a Syrian business contact" that Shanica was pressing Syrian officials to allow the company to do business in Syria. Tab 11, AR 169. In the second letter, RCI's ▆▆▆▆▆▆ alleged (without supporting evidence) that Shanica was affiliated with another company ▆▆▆▆ that ▆▆▆▆▆ purchased fuel from another company ▆▆▆▆▆▆, and that there were "concerns regarding the origin and quality of the fuel" of ▆▆▆▆▆▆ relating to Iranian fuel. Tab 23, AR 864. Finally, after the award announcement, the third letter alleged (among other things) that "RCI learned from ▆▆▆▆▆▆▆, an acquaintance based in Erbil, Iraq, that members of the Erbil Airbase's Regional Contracting Office ("RCO") had improperly disclosed offerors' proposal pricing to Shanica." Tab 30, AR 1054. The third letter further alleged that Hawax and Shanica were affiliated based on hearsay from "▆▆▆▆▆▆▆▆▆," that ▆▆▆▆▆▆▆▆▆▆▆ had told him that "Hawax is Shanica and Shanica is Hawax." Tab 30, AR 1055.

The contracting officer considered RCI's allegations, reviewed Shanica's and Hawax's proposal information, and also contacted Shanica and Hawax by letter and asked a series of questions on the issues raised by RCI's allegations. Tab 38, AR 1298-1299; Tab 39, AR 1306-1307. To investigate the allegations regarding procurement integrity, the contracting officer also (1) issued questions to contracting personnel on the source selection team and personnel from the DLA Energy Middle East office, (2) reviewed Shanica's and Hawax's proposed prices and compared them with proposed prices of other offerors, and (3) sent letters to Hawax and Shanica with relevant questions. Tab 40, AR 1318-1320.

Based on the investigation, the contracting officer concluded that "RCI has not provided sufficient information to show that either Shanica or Hawax committed a [Procurement Integrity Act] violation." Tab 40, AR 1323. The contracting officer found that the Erbil Airbase Regional Contracting Office accused of disclosing RCI's price data "had no involvement" with DLA's solicitation and never had RCI's pricing in the first place. Tab 40, AR 1321-1322 (finding "no evidence that such information was shared" with the Erbil Airbase Regional Contracting Office).

In addressing responsibility, the contracting officer found that RCI's allegations regarding affiliation and fuel source were unsubstantiated. Tab 38, AR 1298-1304; Tab 39, AR 1306-1313. As the contracting officer explained, RCI's allegations regarding fuel source conflicted with the fuel source data sheets and certificates of quality submitted by Shanica and Hawax. Tab 38 AR 1301-1302; Tab 39, AR 1310-1311.

Finally, based on questions to Hawax and Shanica, the contracting officer found the evidence insufficient to support RCI's claims of affiliation between the other awardees, and also found that there was a reasonable explanation for certain similarities found in Shanica's and Hawax's proposals. *See, e.g.* Tab 39, AR 1312. Specifically, Hawax explained that (1)

10

██████████████████████████

████████████████████████████████████

█████████████████████████████ " and that (2) Hawax "███████████

██████████████████████████████████████

██████████ ." *Id*.  The contracting officer found this was "a reasonable explanation for

similarities among the proposals," and further explained that "[s]uch similarity does not establish

that something improper or illegal occurred." *Id.*

G.    RCI Files A Second Protest With The GAO

On January 23, 2024, RCI filed a second GAO protest.  Tab 47, AR 1349-1376 (docketed

as B-421772.4).  RCI raised five different challenges, arguing that: (1) the procurement was

tainted by Procurement Integrity Act violations, Tab 47, AR 1356-1361, (2) Hawax was

ineligible for contract award because it allegedly wasn't registered in the System for Award

Management (SAM), Tab 47, AR 1361-1362, (3) Hawax's and Shanica's proposals contained

material misrepresentations regarding technical acceptability, Tab 47, AR 1364-1368, (4) DLA's

price realism analysis was unreasonable, Tab 47, AR 1368-1371, and (5) DLA failed to conduct

a reasonable responsibility determination, Tab 47, AR 1371-1373.  After DLA filed its agency

report, RCI filed comments on the report and withdrew its grounds related to the alleged

Procurement Integrity Act violations and SAM registration. Tab 60, AR 1676 & n.2.  It also

attached a February 16, 2024 letter that was submitted to DLA *after* the protest was filed alleging

"fraud and wrongdoing by Hawax Corporation."  Tab 60, AR 1691.

G.    Before The GAO Issues A Decision, RCI Files Suit In This Court

Thirteen days before the deadline for the GAO's decision, RCI filed a bid protest

complaint in this Court challenging the awards to Shanica and Hawax.  Compl. ECF No. 1.

When RCI filed its protest in this Court on April 19—thirteen days before the deadline for a

GAO decision—the GAO protest was fully briefed and awaiting decision. After RCI filed its complaint in this Court, the GAO dismissed the protest.

  H.  <u>At This Court's Request, The GAO Issues An Advisory Opinion</u>

  On April 26, 2024, this Court issued an order requesting that the GAO provide an advisory decision on RCI's protest. Order, ECF No. 11. In accordance with this Court's order, the GAO filed its advisory opinion on May 9, 2024. Advisory Op., ECF No. 20; *see also* Tab 110, AR 5565.

  As explained in the advisory opinion, the GAO would have denied RCI's protest on all remaining protest grounds. Tab 110, AR 5565-5574. First, the GAO would have denied RCI's arguments that Shanica and Hawax misrepresented the source of their fuel and their ability to perform the contracts—which the GAO construed as a claim that the "agency misevaluated awardees' proposals. Tab 110, AR 5565, 5568-5569. As the GAO explained, "the evaluation was reasonable and consistent with the solicitation criteria." Tab 110, AR 5565. The GAO also would have denied RCI's protest of DLA's price realism assessment, when DLA "compared prices of acceptable offerors, determined that price differences were relatively small, and reasonably concluded the awardee's low prices were realistic." *Id.* Finally, the GAO would have denied RCI's challenge to DLA's "affirmative determination of responsibility," because DLA "considered allegations of improper and illegal acts," "obtained responses from the awardees, and reasonably determined that the responses were credible, consistent, and supported the responsibility determination." *Id.*

  I.  <u>RCI Is Unable To Perform Its Current Contract In Syria</u>

  During the prior GAO protests, DLA used short-term purchase orders—awarded to RCI on a sole-source basis—to ensure uninterrupted fuel supply to all locations in Syria and in Erbil,



Iraq.  *See* Rodriguez Decl. ¶ 5.  On April 11, 2024, DLA learned of a concern with RCI's access

to Syria.  *Id.* ¶ 6.  The contracting officer received an email from ████████████████████████

█████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████.  *Id.* ¶ 6.  The email stated that ████████████████

██████████████████████████████████████████████████.  *Id.*

¶ 6.

    The contracting officer contacted RCI on April 16, 2024, to bring the issue to RCI's

attention and asked RCI to provide assurances of access into Syria.  *Id.* ¶ 7.  Although RCI provided

the requested assurances, *id.*, on ███████████████████████████████████████████████

███████████████████████████████████████.  RCI was therefore unable to make its

required deliveries.  *Id.* ¶ 7.

## SUMMARY OF ARGUMENT

    RCI's protest to DLA's award of the contract for CLINs 1-13 for fuel deliveries in Syria

should be dismissed as moot.  The contract award to Shanica for CLINs 1-13 requires access to

Syria to make the required deliveries.  Since RCI filed this case, it has become clear that RCI

cannot make deliveries to Syria.  Thus, RCI could not be awarded the contract for CLINs 1-13,

and there is no remaining relief that the Court could order with respect to these CLINs.  Any

remaining dispute on this topic is therefore academic.  Because there is no remaining case or

controversy with respect to CLINs 1-13, the Court should dismiss-in-part RCI's protest with

respect to the contract award to Shanica.

    In the alternative, RCI fails to demonstrate any basis for disturbing DLA's awards to

Shanica (to the extent the court reaches the merits of that award) or to Hawax.  Although not

dispositive, the GAO's advisory opinion—stating that it would have denied RCI's protest—is

instructive.  As the GAO explained, DLA rationally investigated the unsupported allegations raised by RCI and concluded that Shanica and Hawax were responsible, technically acceptable, and offered realistic prices.

Having failed on its arguments at the GAO, RCI now argues that the term ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ misrepresents that each company has an ▮▮▮▮▮▮▮▮ to purchase the fuel.  But RCI has not shown that the reference to an ▮▮▮▮▮▮▮▮▮▮ in certain letters of commitment converted those letters into ▮▮▮▮▮▮▮—particularly when the ▮▮▮ Refinery provided a similar letter to two other offerors in addition to Shanica and Hawax.  In any event, the references to ▮▮▮▮ are immaterial because the solicitation did not require ▮▮▮▮▮ under any meaning of the term.  RCI's remaining arguments regarding price realism and responsibility merely rehash claims that the GAO correctly rejected. Because DLA rationally determined that all awardees offered realistic pricing and found Shanica and Hawax to be responsible prospective offerors, there is no basis to disturb DLA's awards to Shanica and Hawax.

Finally, RCI is not entitled to an injunction or other relief that would be tantamount to an injunction, when its proposed injunctive relief could jeopardize fuel deliveries that are critical to Department of Defense operations in Syria and Iraq.

## ARGUMENT

I.    Legal Standards

A.    Standard Of Review For 12(b)(1) Motion To Dismiss

If this Court determines at any time that it does not possess jurisdiction, the case must be dismissed.  RCFC 12(b)(1); RCFC 12(h).  "[D]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the

plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1464 (Fed. Cir. 1997) (citations omitted). When deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the Court may consider evidentiary matters outside the pleadings. *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985) (citations omitted).

    B.    <u>Standard Of Review For Bid Protests</u>

    "In a bid protest case, an agency's decision to award a contract must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (quoting *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005)); *see also* 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706(2)(A)). This Court may only set aside the agency's procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). Applying "highly deferential" rational basis review, "the court must sustain an agency action unless the action does not 'evince[] rational reasoning and consideration of relevant factors.'" *PAI Corp.*, 614 F.3d at 1351 (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.*, 564 F.3d at 1381.

    Agency procurement decisions are entitled to a "presumption of regularity," *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (citation omitted), and contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," *Impresa Construzioni Geom. Domenico Garufi v.*

*United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotations and citation omitted).

Therefore, a court may not "substitute its judgment for that of the agency." *Ala. Aircraft Indus.,*

*Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) (quoting *Motor Vehicle*

*Mfrs. Ass'n  v. State Farm*, 463 U.S. 29 (1983)).

To prevail in a bid protest, the plaintiff must also prove "significant prejudice" from an

error in the procurement process.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351, 1353

(Fed. Cir. 2005).  Further, "because injunctive relief is relatively drastic in nature, a plaintiff

must demonstrate that its right to such relief is clear." *CRAssociates, Inc. v. United States*, 95

Fed. Cl. 357, 368–69 (Fed. Cir. 2010) (citation omitted).  This Court "will interfere with the

government procurement process 'only in extremely limited circumstances.'" *Id.* at 367–68

(2010) (quoting *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

II.     RCI's Challenge To The Contract Award To Shanica For CLINs 1-13 Is Moot Because
        RCI Cannot Make Deliveries To Syria

Since filing its complaint, RCI has been unable to provide deliveries in Syria or provide

assurance of its ability to access Syria in the future, thereby mooting RCI's challenge to the

contract award to Shanica for CLINs 1-13, for fuel deliveries to Syria.  RCI cannot be awarded

any contract for fuel deliveries to Syria when RCI lacks access to Syria to make such deliveries.

Because there is no remaining case or controversy with respect to DLA's award of CLINs 1-13

to Shanica for fuel deliveries in Syria, RCI's challenge to that award should be dismissed for

lack of jurisdiction.

A.      A Protest Is Moot When The Court Is Unable To Remedy The Alleged Injury
        And The Parties Lack A Cognizable Interest In The Outcome Of The Case

Although established under Article I of the Constitution, the Court of Federal Claims

"applies the same standing requirements enforced by other federal courts created under Article

16

III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)). "Article III (§ 2, cl. 1) of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" S*uper. Waste Mgt. LLC v. United States*, 169 Fed. Cl. 239, 252 (2024) (citing *Town of Chester, N.Y. v. Laroe Ests., Inc*., 581 U.S. 433, 438 (2017)). "The Supreme Court has developed 'specific but overlapping doctrines rooted in the same [case-or-controversy] Article III inquiry, which must be met for a controversy to be justiciable, including standing, ripeness, and a lack of mootness.'" *Id.* (quoting *Prasco, LLC v. Medicis Pharm. Corp*., 537 F.3d 1329, 1336 (Fed. Cir. 2008)); *see also id.* (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

Accordingly, an actual case or controversy must exist at all stages of review, not simply when the action was filed. *DeFunis v. Odegaard*, 416 U.S. 312, 31 (1974) (citations omitted). Requirements for a case or controversy include: 1) an "injury in fact"; 2) "a causal connection between the injury and the conduct complained of"; and 3) a likelihood that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).

A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (citation omitted). "When, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed." *Chapman Law Firm Co. v. United States*, 490 F.3d 934, 940 (Fed. Cir. 2007).



**B.**    **RCI Can No Longer** ███████████████, **Mooting Its Challenge To The Award To Shanica For CLINs 1-13**

When it filed this protest, RCI was on notice of concerns regarding its access to Syria.

*See* Rodriguez Decl. ¶ 7.  "████████████████████████████████████

███████████████████████████████████." *Id*. ¶ 8.  "████████████████████

████████████████████████████████." *Id*. ██████████

████████████████████████████████████████████████████

██  Although RCI contested it was at fault for the ████████████, it did not dispute that it did

not have access to Syria.  *Id*.

Because RCI is unable to ███████████████████████, RCI is not eligible to

receive the disputed contract award for deliveries to Syria, CLINs 1-13.  Access to Syria is one of the

gateway requirements for this contract. Tab 1, AR 148; Rodriguez Decl. ¶ 4.  RCI's inability to

deliver to Syria renders it ineligible for award under the gateway factors and as a responsible

contractor capable of performing the required fuel supply and deliveries.  *See* Tab 1, AR 148.

Because RCI cannot be awarded a contract for CLINs 1-13, its challenge to the contract

award to Shanica is now moot.  There is no "live" dispute regarding the Shanica contract, and "the

parties lack a legally cognizable interest in the outcome."  *Geraghty*, 445 U.S. at 396 (citation

omitted).  Nor is there any remaining relief that the Court may order regarding CLINs 1-13 for fuel

deliveries to Syria.  Because "the questions originally in controversy between the parties are no

longer at issue, the case should . . . be dismissed."  *Chapman Law Firm*, 490 F.3d at 940.

Accordingly, we respectfully request that the Court dismiss-in-part RCI's complaint, with

respect to the contract award to Shanica for CLINs 1-13.

III.    DLA Rationally Awarded Contracts To Shanica And Hawax When They Were The
        Lowest-Priced, Technically Acceptable Offerors For CLINs 1-13 and 15-17,
        Respectively

In the alternative, DLA rationally awarded the contract to Shanica for CLINs 1-13, and

also rationally awarded the contract for CLINs 15-17 to Hawax.  This procurement was

evaluated on a lowest-priced, technically acceptable basis.  DLA rationally rated Shanica's and

Hawax's proposals as "acceptable" with regard to the technical subfactors and past performance.

*See* Tab 24, AR 865-894; Tab 38, AR 1297-1304; Tab 39, AR 1305-1313; Tab 41, AR 1332;

Tab 42, AR 1333.  DLA also found that Shanica and Hawax offered the lowest prices for CLINs

1-13 and 15-17, respectively, and that the offered prices were realistic.  Tab 24, AR 894; Tab 37,

AR 1292-1296; Tab 41, AR 1332; Tab 42, AR 1333.  Finally, DLA found that Shanica and

Hawax were responsible.  Tab 38, AR 1297-1304; Tab 39, AR 1305-1313.  DLA's award

decisions comply with the law and its findings are rationally based on the record and the

solicitation criteria.

A.    DLA Rationally Rated Shanica And Hawax As Technically Acceptable

DLA's finding that Shanica and Hawax were technically acceptable reflects "rational

reasoning and consideration of relevant factors.'"  *PAI Corp.*, 614 F.3d at 1351 (quoting

*Advanced Data Concepts*, 216 F.3d at 1058).  DLA rationally determined that Shanica and

Hawax complied with "Sub Factor 1 – Supply"—one of the subfactors comprising the technical

evaluation.  RCI challenges this finding, arguing that Shanica's and Hawax's proposals are

technically deficient by allegedly failing to provide valid source letters of commitment.  RCI Br.

at 22-24.  Based only on the use of the term ████████ in letters of commitment from two

sources, RCI contends that the letters contained in Shanica's and Hawax's proposals are false—

which, according to RCI, amounts to a material misrepresentation in Shanica's and Hawax's

19

proposals. *Id.* at 16-22. RCI bases its arguments on its own interpretation of the letters in Shanica's and Hawax's proposals. *See, e.g.*, RCI Br. at 18 (interpreting the letters of commitment in the proposals). At bottom, RCI merely speculates and second guesses DLA's technical evaluation for the supply subfactor—including DLA's finding that Shanica and Hawax provided the required letters of commitment—a decision entitled to substantial deference.

"In determining whether an agency acted rationally, the court is . . . particularly deferential to the agency's technical evaluation." *Mil-Mar Cent. Corp. v. United States*, 111 Fed. Cl. 508, 523 (2013) (citing *L–3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 664 (2009)). Matters such as "technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). "[T]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." *Mil-Mar Cent.*, 111 Fed. Cl. at 523 (citation omitted).

In this case, DLA rationally rated Shanica and Hawax as "acceptable" on the supply subfactor for the technical evaluation. *See* Tab 24, AR 884. With respect to Hawax, the Source Selection Authority found that "[a]s required in the solicitation, [Hawax] provided acceptable supply chain . . . from vendor source to final delivery." Tab 24, AR 884. Hawax also provided the required "letters of commitment,"[6] Tab 24, AR 884, and its certificates of analysis /

---

[6] Hawax provided ▮ letters of commitment for supplying ▮ fuel that ▮ including letters from (1) ▮, (2) ▮, and (3) ▮. Tab 21, AR 825-827. Hawax also relied on an ▮ ▮ Tab 21, AR 825. Finally, Hawax also provided ▮ from ▮ for SFD (diesel fuel) and MUM (gasoline fuel). Tab 21, AR 827.

certificates of quality (COAs / COQs) "were deemed technically acceptable by the technical evaluators for each fuel type required in the solicitation," Tab 24, AR 884 (stating that COQs can be found on pages 13 – 19 of Technical Proposal, Tab 21, AR 828-835).

Shanica similarly "provided acceptable supply chain from vendor source to final delivery," Tab 24, AR 885; *see also* Tab 19, AR 520 (map of Shanica's sources of fuel and storage facilities), (2) provided the requisite "letters of commitment,"[7] Tab 24, AR 885, and all of Shanica's certificates of analysis / certificates of quality "were deemed technically acceptable by the technical evaluators for each fuel type required in the solicitation," Tab 24, AR 885; Tab 19, AR 529-541.[8]

In its advisory opinion, the GAO stated it would have affirmed DLA's technical evaluation, explaining that RCI's allegations of material misrepresentation actually challenged DLA's rational technical evaluation of the awardee's proposals.  Tab 110, AR 5569.

      1.      The GAO Correctly Rejected RCI's Related Challenge To The Agency's Technical Evaluation, Explaining That The Agency's Evaluation Was Rational

Although not dispositive, the GAO's advisory opinion provides persuasive authority. "GAO decisions may be treated by [this Court] as persuasive authorities on questions of law[.]" *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 338 (2012) (citing *Orion Int'l Techs. v.*

---

[7]  Shanica provided ▮▮ letters of commitment for ▮▮▮▮▮▮, including from the ▮▮▮▮ ▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ for SFD (diesel) and MUM (gasoline) from ▮▮▮▮ and ▮▮▮▮▮▮▮▮.  *See* Tab 19, AR 521, 523-527.

[8]  Notably, of the six companies that passed the gateway criteria, half of the companies— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—were rated as "unacceptable" for the supply subfactor.  Tab 24, AR 884.  The only companies rated as "acceptable" for the supply subfactor were RCI, Shanica, and Hawax.

████████████████████████████

*United States*, 66 Fed. Cl. 569, 573 (2005); *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 503 (2005)).

Before the GAO, RCI argued that both awardees "allegedly misrepresented the source of their fuel and failed to demonstrate the ability to perform their respective contracts." Tab 110, AR 5568. Among other allegations, RCI claimed that Shanica and Hawax "would obtain fuel from Iran, in violation of law," and "misrepresented their ability to transport the fuel." Tab 110, AR 5568; *see also* Tab 60, AR 1679-1680 (RCI also arguing that DLA "ignored" that Shanica and Hawax both "purportedly have ███████████████ with █████ and █████ refineries").

The GAO rejected these arguments, explaining that "[w]here a protester argues that the agency's technical evaluation was flawed," *the GAO will not "reevaluate proposals."* Tab 110, AR 5569 (emphasis added). Instead, the GAO reviews "the record to determine if the evaluation documented in the record was reasonable and consistent with the solicitation's evaluation scheme and applicable law and regulation." *Id.* "The record here provided no basis to question DLA's evaluation of the awardees' technical approaches as acceptable." *Id.* As the GAO explained, the solicitation "required offerors to provide details about their fuel sources and transportation plans." *Id.* "*Both firms did so*, and neither proposal supported [RCI's] allegation that the firm would obtain fuel from Iran." *Id.* (emphasis added). The GAO also rejected RCI's allegations that either Shanica or Hawax "misrepresented its ability to perform with the trucks and other resources in its proposal." Tab 110, AR 5569-5570.

██████████████████████████████

2.      The Source Selection Authority Was Not Required To Find That The Use Of The Word ███████ Meant That The Supply Letters Of Commitment Were False

Having failed to persuade the GAO of any "material misrepresentation," RCI now argues that the reference to the term ██████ in Shanica's and Hawax's letters of commitment from the ███████████ demonstrates that those letters contain material misrepresentations and that DLA relaxed the solicitation's requirements.  RCI Br. at 18-24. However, this challenge to DLA's technical acceptability rating provides no reason for second guessing DLA's rational technical evaluation.

This Court's prior cases have stated that to establish a material misrepresentation, "plaintiff must demonstrate that (1) the awardee made a false statement; and (2) the agency relied upon that false statement in selecting the awardee's proposal for the contract award." *Connected Glob. Sols., LLC v. United States*, 159 Fed. Cl. 801, 805–06 (2022) (citing *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006) (citation omitted), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007); *Sealift, Inc. v. United States*, 82 Fed. Cl. 527, 538 (2008)).  RCI has not come close to meeting this standard.  Rather than demonstrating that Shanica or Hawax made a false statement, RCI offers speculation regarding the meaning of the term ███████ in multiple letters of commitment in Shanica's and Hawax's proposals.

Specifically, Hawax's and Shanica's letters of commitment from the ████████ and ████████ reference ██████████████████████ *See* Tab 19 at 524-525, Tab 21 at 825-826.  At least two other offerors submitted letters from █████ with similar language.  For example, █████ submitted a supply letter of commitment from █████ stating "█████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

23

██████████████████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████████████████.” Tab

88, AR 5278 (capitalization and emphasis altered).  Similarly, another offeror, ████, submitted a

letter from ██████ stating: “████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████.” Tab 85, AR 4791

(capitalization and emphasis altered).  Thus, multiple offerors relied on the same refineries and

used similar letters.  RCI has made no claim of any relationship or affiliation between ████

████, Shanica, and Hawax.

RCI argues that the reference to “████████” promises an “'exclusive license'” that “gives

the licensee the sole right to perform the licensed act, often in a defined territory, and that

prohibits the licensor from performing the licensed act and from granting the right to anyone

else.”  RCI Br. at 18 (quoting LICENSE, Black's Law Dictionary (11th ed. 2019)).  But RCI's

argument relies on the definition of the term “license”—which does not appear in the

commitment letters.  Contrary to RCI's argument, a supply letter of commitment does not reflect

a “license”—defined as “[a] privilege granted by a state or city upon the payment of a fee, the

recipient of the privilege then being authorized to do some act or series of acts that would

otherwise be impermissible.”  LICENSE, Black's Law Dictionary (11th ed. 2019).  Nor does the

secondary definition of license apply—“A permission, usu. revocable, to commit some act that

would otherwise be unlawful; esp., an agreement . . . that it is lawful for the licensee to enter the

licensor's land to do some act that would otherwise be illegal, such as hunting game.”  *Id.*  Thus,

RCI's argument is premised on the incorrect assumption that the letters of commitment qualify

as a “license.”

In any event, RCI has not demonstrated that an Iraqi oil refinery's use of the phrase "█████████████" in a letter of commitment—when the refinery provided similar letters to multiple offerors—necessarily reflects an ██████████████████. The letters do not explain or define what aspects of agreement are "███████." In context, RCI has not shown that it was irrational for the contracting officer to rely on the letters of commitment in assessing technical capability. To the contrary, the contracting officer's decision is consistent with the commonsense conclusion that letters of commitment referencing an "███████████████" provided to multiple different companies do not reflect an ████████████████.

RCI nonetheless attempts to demonstrate a material misrepresentation based on the commitment letters' reference to "█████████." According to RCI, "the seemingly false proposal representations in the Shanica and Hawax source letters of commitment are material because DLA relied on the letters of commitment when determining that Shanica and Hawax were technically acceptable." RCI Br. at 18. As discussed above, however, RCI has failed to demonstrate "falsity" in the use of the term ███████.

RCI's material misrepresentation argument fails for the independent reason that RCI has not demonstrated that any alleged inconsistency is material. To demonstrate materiality, RCI must show that DLA relied on the alleged "false statement in selecting the awardee's proposal for the contract award." *Connected Glob. Sols., LLC v. United States*, 159 Fed. Cl. 801, 805–06 (2022) (citations omitted). RCI cannot satisfy that standard. Even accepting RCI's proposed meaning of "███████" for the sake of argument, nothing in the solicitation required such ███████. There was no requirement for offerors to demonstrate the ability to supply fuel from companies *who had agreed not to supply any other purchasers*. RCI makes no attempt to

demonstrate otherwise.  Indeed, RCI's own proposal makes no promise of ███████, under any

definition of the term.  *See, e.g.*, Tab 16, AR 201 (the letter of commitment from █████).

Because ███████ was not a requirement of the solicitation, any further dispute regarding the

meaning of "████████" is beside the point.

Recognizing this problem with its argument, RCI attempts to go one step further, and

argues that the reference to "████████" shows that the letters of commitment themselves are

"false."  RCI Br. at 20.  Yet, aside from RCI's claims that the commitment letters amount to

exclusive licenses—rebutted above—RCI offers no support for this clam.  RCI has not

demonstrated that the commitment letters are false or that DLA lacked any rational basis for

considering those letters in rating Shanica and Hawax technically "acceptable" for the supply

subfactor.

Because RCI fails to show that █████ and █████ did not provide the relevant letters of

supply, any alleged misrepresentation in those letters would be attributable to the █████ or █████

█████████ not to the awardees.  Indeed, because RCI also used █████████ and █████ █████████ to

support its supply plan, such a claim impugning the reliability of █████ or █████ would equally

impact RCI's offer.

By alleging material misrepresentation based on the very same proposals considered by

DLA, RCI merely second guesses DLA's technical evaluation that Shanica's and Hawax's

proposals were technically acceptable.  Indeed, RCI claims that "the administrative record

contains all the facts needed for this Court to conclude that the Shanica and Hawax proposals

contain intentional, material misrepresentations."  RCI Br. at 20.  Dressing up the claim as a

"material misrepresentation" argument does not change the statutory standard of review, 28

U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), or the binding precedent that matters such as

"technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449.  None of RCI's arguments demonstrate any legal error by DLA, nor do they demonstrate that DLA was arbitrary and capricious in finding Hawax's and Shanica's proposals to be technically acceptable.

### 3.    RCI's Technical Arguments Are Similarly Unpersuasive

RCI also raises its technical challenge explicitly, arguing that "[b]ased on the proposals submitted, the contracting officer could not rationally determine whether Hawax or Shanica have any commitment at all from the ▆▆▆ or ▆▆▆▆▆▆  *See* RCI Br. at 22-24.  As discussed above, however, DLA rationally reviewed the letters of commitment submitted by Hawax and Shanica and concluded that the letters—which were signed or stamped by representatives of the relevant refineries—satisfied the solicitation's requirement for letters of commitment.  *See* Tab 24, AR 884-885.  Accordingly, DLA's reasonable award decisions should be affirmed.

### 4.    Discovery Is Not Appropriate

Finally, RCI's request for discovery should be rejected.  *See* RCI Br. at 21 & n.9, Ex. 1.  It is well established that in a bid protest case, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1379 (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  This is because "[t]he task of the reviewing court is to apply the appropriate [Administrative Procedure Act (APA)] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."  *AgustaWestland N.A., Inc. v. United States*, 880 F.3d 1326, 1331 (Fed. Cir. 2018) (quoting *Axiom*, 564 F.3d at 1379).

"The purpose of limiting judicial review to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review." *Id.* (quoting *Axiom*, 564 F.3d at 1580) (internal citations omitted). "Therefore, supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review"—with the understanding that judicial review is "'effective' *if it is consistent with the APA*." *Id.* (quoting *Axiom*, 564 F.3d at 1380) (internal quotation marks omitted) (emphasis added).

RCI admits that "administrative record before this Court already contains sufficient evidence" to support RCI's claims, and presumably for that reason did not file a motion for discovery. RCI Br. at 21-22. Nonetheless, RCI states that "[t]o the extent this Court concludes that additional evidence is necessary to determine whether the elements of material misrepresentation are satisfied, then this Court should enable the parties to obtain and produce that additional information." RCI Br. at 21-22. To the extent RCI requests discovery in support of its material misrepresentation claim, that request should be denied. RCI has not demonstrated that the requested discovery is necessary for effective judicial review—pursuant to the APA standard—of DLA's finding that Shanica and Hawax were technically acceptable. Absent such a showing, RCI is not entitled to discovery. *AgustaWestland N.A.*, 880 F.3d at 1331.

Finally, given the international context, even the limited discovery requested by RCI is unworkable—presenting an independent basis for rejecting any discovery request. RCI attached to its brief multiple interrogatories to non-parties, RCI Br. at 21 n.9, including two Iraqi refineries and two companies located in Iraq. ECF No. 24-1 (May 24, 2024).[9] RCI proposes

---

[9] Specifically, RCI seeks discovery from ███████████████████████ (located in Iraq, *see, e.g.*, Tab 21, AR 823), ████████████ (located in Iraq, *see, e.g.*, Tab 21, AR 823),

that it will "serve ███████████ (which operates the ███████████) and ███████████ion (which operates the ███████████) in Iraq through letters of request."  RCI Br. at 21 n.9.  RCI does not explain how it will serve Shanica or Hawax.

RCI has not demonstrated that its proposed approach is necessary for "effective judicial review," *AgustaWestland*, 880 F.3d at 1331, or even that it is feasible for obtaining evidence from third parties located in Iraq.  In many jurisdictions, evidence-gathering is a purely sovereign function.  Under customary international law, "a state may not exercise jurisdiction to enforce in the territory of another state without the consent of the other state."  Restatement (Fourth) Foreign Relations Law of the United States § 432 (Am. Law Inst. 2018).  Examples of enforcement jurisdiction include "serving compulsory process," "taking depositions and witness statements," and "executing an order for the production of documents."  *Id.* Reporters' Note 1.  The Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231 (Hague Evidence Convention) is the primary multilateral instrument for judicial assistance matters to which the U.S. is  party.  Iraq is not a party to the Hague Evidence Convention.

Absent a showing that Iraq permits evidence-gathering from cooperating witnesses on its territory (which RCI has not provided and the Government is not aware of any public statement of Iraq's position), a formal request seeking Iraq's assistance would generally be required—typically by conveying letters rogatory through diplomatic channels.  Letters rogatory are generally issued by a U.S. court, transmitted to the U.S. Department of State, transmitted to the U.S. Embassy of the receiving state, then sent to the Ministry of Foreign Affairs in the receiving

---

Shanica (located in Iraq, Tab 25, AR 895), and Hawax (located in Iraq, Tab 26, AR 975).  ECF No. 24-1 (May 24, 2024).

country through diplomatic channels, who forwards them to the competent foreign court or

agency for execution. *See* 22 C.F.R. § 92.66(b) (explaining transmission of letters rogatory to a

foreign official through diplomatic channels). This process is time-consuming—potentially

ranging from six months to more than a year.[10] Further process would be required if the

interrogatory recipients do not respond voluntarily, and evidence must be compelled.

     RCI appears to recognize the time-consuming nature of its requests, stating that "the

Court may eventually need to consider means to preserve the *status quo* pending any such

remand or discovery, including the need for emergency or preliminary injunctive relief." RCI

Br. at 22 n.10. But not only has RCI failed to demonstrate entitlement to such preliminary

injunctive relief, any further delay of this procurement would conflict with the limits imposed on

this Court's exercise of bid protest jurisdiction. 28 U.S.C. § 1491(b)(3). In exercising bid

protest jurisdiction, this Court "shall give due regard to the interests of national defense and

national security and the need for expeditious resolution of the action." *Id.* In light of this

obligation, it would be inappropriate to place important fuel deliveries contracts on hold or to

restrict DLA's exercise of discretion when operating in a complex international context while

awaiting tangential and unnecessary discovery from third parties in Iraq.

     In sum, RCI is not entitled to discovery at all, and—in light of the burden associated with

international discovery and delay in resolution of this case—fails to support the need for the

specific discovery requested in Exhibit 1.

---

[10] *See, e.g.*, Preparation of Letters Rogatory, U.S. Dep't of State,
https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-
asst/obtaining-evidence/Preparation-Letters-Rogatory.html (last accessed on June 7, 2024).

B.    DLA's Price Realism Analysis Was Rational

RCI's challenge to DLA's price realism analysis is also unpersuasive.  *See* RCI Br. at 24-32.  "Although the FAR requires contracting officers to evaluate the reasonableness of offerors' proposed prices to ensure that the prices are fair and reasonable," it does not require that a "price realism analysis be performed."  *Mil-Mar Cent. Corp.*, 111 Fed. Cl. at 540 (citing FAR 15.404–1(a)(1)) (cleaned up and other citations omitted).  Nonetheless, an agency may "at its discretion" provide for a price realism analysis in the solicitation.  *See id.* (quoting *Ceres Environmental Servs., Inc. v. United States*, 97 Fed. Cl. 277, 303 (2011)).   In reviewing an agency's price realism determination, the only question for the Court is whether "the agency's price-realism analysis was consistent with the evaluation criteria set forth in the [solicitation]" and otherwise rational.  *See Ala. Aircraft Industries, Inc.-Birmingham*, 586 F.3d at 1375–76 (*Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)); 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706).

In this case, the solicitation provides that "[w]hen evaluating Price, the Government will . . . look at Price Realism to determine if a low price reflects the contractor's ability to understand the inherent risk in the requirement."  Tab 1, AR 146, 151.  Applying this standard, DLA reviewed "all three lowest price technically acceptable offerors"—Shanica, RCI, and Hawax—and determined "that all three companies have offered realistic prices."  Tab 37, AR 1292; Tabs 41-42, AR 1332-1333.  This price realism analysis is rational and consistent with the solicitation's terms.  RCI's arguments to the contrary are unpersuasive.

1.    DLA Rationally Determined That The Price Offered By Shanica For
CLINs 1-13 Was Realistic

In addressing CLINs 1-13 for Syria locations, the contracting officer "conducted a comparison of Shanica and RCI's prices for CLINs 1 – 13," when RCI and Shanica were the

31

"only two companies found technically acceptable for these CLINs." Tab 37, AR 1293. The

contracting officer found that Shanica's price of approximately $82.4 million was not

significantly lower than RCI's price of approximately ███████. *Id.* The difference of

approximately $██████ was not significantly lower "for an approximately three year contract

for an estimated 16,226,400 U.S. gallons of fuel." *Id.* After reviewing the contracting officer's

price realism analysis, the Source Selection Authority found that Shanica's "offer prices for

CLINs 1-13 are realistic." Tab 41, AR 1332.

RCI argues that "the realism of a price cannot be determined solely by its proximity to

the next lowest price," because "[b]oth [prices] can be unrealistic." RCI Br. at 26; *see also id.* at

27 (citing *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588 (2023)). But this argument makes

no sense when the comparator is *RCI's own price*. Any argument that both RCI's and Shanica's

prices are unrealistic would disqualify not only Shanica but *also* RCI—preventing RCI from

demonstrating the "significant, prejudicial error in the procurement process" required to prevail

in a bid protest. *WellPoint Military Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir.

2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir.

1999)). Any argument resting on the claim that RCI's own price was unrealistic would render

RCI ineligible for award—and thus unable to demonstrate "prejudicial" error in the procurement

process. *Id.*

In any event, DLA's methodology of comparing the prices of the two technically

acceptable offerors was reasonable. Again, the solicitation stated that DLA would consider price

realism "to determine if a low price reflects the contractor's ability to understand the inherent

risk in the requirement." Tab 1, AR 151. In such cases, "an acceptable price realism

methodology may include '*comparison of the prices received with each other*; comparison of

previously proposed prices for the same or similar items; comparison with the [IGCE]; and analysis of pricing information provided by the offeror.'" *Mil-Mar Cent. Corp.*, 111 Fed. Cl. at 542 (quoting *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009)) (cleaned up) (emphases added).  Thus, by comparing the prices proposed by all technically acceptable offerors, DLA used a valid methodology.

RCI nonetheless argues that the case is similar to *DigiFlight*, in which this Court held that an agency's price realism analysis was unreasonable when the agency "'failed to consider an important aspect of the problem,'" namely, the possibility that both of the lowest priced offerors "proposed unrealistic prices."  *DigiFlight*, 165 Fed. Cl. at 600.  In *DigiFlight*, the lowest-priced offerors "offered composite rates *well below* the IGCE [independent government cost estimate] composite rates"—but the agency nonetheless found their prices reasonable based on the assumption that two offerors would not have offered unrealistically low rates.  *Id.* at 596 (emphasis added).

Even in *DigiFlight*, however, the Court did not hold that "comparing prices is a per se unacceptable method of evaluating price realism."  *See id.* at 601 (explaining plaintiff's argument).  The Court did not disagree with the argument that—in general—"comparing prices between offerors is 'one of the allowable methods to test [price] realism.'"  *See id.* (citing, *e.g.*, *Mil-Mar Century Corp.*, 111 Fed. Cl. at 542).  Rather, the Court found that this general principle was "largely non-responsive" to the plaintiff's argument—that the agency's price realism analysis was irrational *in that specific case*, in which the agency disregarded offerors' pricing below the independent government cost estimate based on the assumption that two offerors would not submit unrealistic prices.  *See id.*  Unlike in *DigiFlight*, Shanica's and RCI's prices were not below any independent government cost estimate, so there was no reason to doubt that

price comparison provided a sound method of assessing price realism.  In this case, DLA rationally compared offeror prices and explained that Shanica's price (approximately $82.4 million) was not significantly lower than RCI's (approximately $██████).

2. DLA Rationally Determined That The Price Offered By Hawax For CLINs 15-17 Was Realistic

DLA also rationally determined that the prices offered by Hawax for CLINs 15-17 for fuel deliveries to Erbil, Iraq, were realistic.

Using CLIN 15 as an example, DLA compared prices among RCI, Shanica, and Hawax, finding that "there was adequate price competition for CLIN 15, and all technically acceptable offerors (Hawax, Shanica, and RCI) were reasonably close in price."  Tab 37, AR 1295.  The per-gallon price for CLINs 15-17 ranged from $4.031772 per U.S. gallon to $██████ per U.S. gallon, which equated to total evaluated prices ranging from $5,225,176.51 to $██████.  *Id.* "Based alone on this range and adequate price competition," the contracting officer found that "Hawax's price is realistic and not too low."  *Id.*

Despite finding that the ranges alone supported price reasonableness, the contracting officer also "analyzed Hawax's $██████/U.S. gallon 'differential/expenses'" for CLIN 15. Tab 37, AR 1295.  The differential reflects "the difference between the reference price and the Total Offer Price per U.S. gallon."  Tab 37, AR 1295.  "The reference price is the market price for fuel, published in an independent publication (Platts) with which the award price fluctuates." *Id.*  Notably, "[t]he reference price is a market index"; thus, although "the actual price an offeror pays for fuel from a given refinery may be more or less than the reference price," the reference price "serves as an approximation of an offeror's anticipated fuel cost."  *Id.*  "The differential/expenses figure generally captures the costs (beyond fuel), expenses, and profit an offeror wishes to build into its price to calculate the Total Offer Price per U.S. gallon."  *Id.*

The contracting officer rationally found that Hawax's differential for CLIN 15 did not make its price so low as to suggest it does "not understand the requirement," thus confirming that its pricing was "realistic." Tab 37, AR 1295. For CLIN 15, Hawax's price per U.S. gallon included $▨▨▨ for differential/expenses "above and beyond what it reasonably expects to pay for the JP8 under CLIN 0015." *Id.* "This is modestly lower than its competition (Shanica ($▨▨/U.S. gallon) and RCI ($▨▨/U.S. gallon)." Tab 37, AR 1295. "However, there is only an approximately $▨▨/U.S. gallon difference between Hawax and the next lowest offeror, Shanica, while the difference between Shanica and the highest technically acceptable offeror (RCI) is $▨▨/U.S. gallon." *Id.*

The contracting officer determined that Hawax's modestly lower price for differential / expenses reflected "a modest range within which offerors may adjust their expenses/costs/profit for the ultimate price offer to the Government." Tab 37, AR 1295. Furthermore, the contracting officer found that Hawax's differential "leaves an adequate margin, above and beyond the estimated cost of fuel (the reference price), to cover the remaining costs, expenses, and profit to supply the required fuel." *Id.* "Therefore, Hawax's differential does not make its price so low as to suggest it does not understand the requirement." *Id.*

RCI argues that DLA's analysis of the price differential "lacks basic explanation" and merely "arranges the prices, calculates the mathematical difference, and concludes that any differences are 'modest'" RCI Br. at 30-31. But assessing the mathematical difference between prices and determining its significance (or insignificance) *is* an explanation—and falls within the "broad range of issues" on which contracting officer are entitled to deference. *Impresa*, 238 F.3d at 1332.

The contracting officer performed a similar analysis for CLINs 16 and 17. "In each case, based alone on the range between the lowest and highest offer prices"—Hawax's and RCI's prices—"and adequate price competition, Hawax's price is realistic and not too low." Tab 37, AR 1296. "Moreover, Hawax's differential/expenses for CLIN 16 is the same as for CLIN 15 ($▒▒▒▒) and higher for CLIN 17 ($▒▒▒▒)." *Id.* "Therefore, based on the same rationale the Contracting Officer evaluated Hawax's low price for CLIN 15 to be realistic, the Contracting Officer also evaluates Hawax's low prices for CLINs 16 and 17 to be realistic." *Id.* The Source Selection Authority reviewed the contracting officer's analysis and concluded that "Hawax Corporation's offer prices for CLINs 15-17 are realistic." Tab 41, AR 1332.

RCI challenges DLA's assessment, claiming that the contracting officer improperly disregarded the possibility that multiple offerors submitted unrealistically low prices. *See* RCI Br. at 26-27. Again, however, the contracting officer rationally found that the range between Hawax's and RCI's price supported the realism of the former—and RCI lacks statutory standing to contest that its own prices are realistic. *See CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023) (requiring a substantial chance of receiving an award). To the extent RCI claims that its price was realistic, but Hawax's was not, it fails to demonstrate that DLA's finding to the contrary is arbitrary or capricious. Using CLIN 15 as an example, the contracting officer rationally determined that a price difference between approximately $4.03 per U.S. gallon (Hawax's price) versus approximately $▒▒▒ per U.S. gallon (RCI's price) itself showed that "Hawax's price is realistic and not too low." Tab 37, AR 1295. This is precisely the sort of judgment that is uniquely within the expertise and discretion of procurement personnel. *Impresa*, 238 F.3d at 1332 (explaining that contracting officers are "entitled to exercise

discretion upon a broad range of issues confronting them" in the procurement process") (citation omitted).

To be sure, the contracting officer also explained that the small price difference between RCI and the next lowest-priced offeror—Shanica—further supported the realism of Hawax's price. Tab 37, AR 1295. RCI claims this reasoning was irrational because (1) price was the dispositive factor in choosing between technically acceptable proposals, so "Shanica and Hawax had every reason to submit unrealistic proposals," and (2) RCI had raised allegations that Shanica and Hawax coordinated their proposals. RCI Br. at 28. As an initial matter, the Court need not reach these arguments because DLA's price realism analysis is adequately supported by its analysis of the price range between Hawax and RCI and on the adequacy of Hawax's price differential to cover its costs. Tab 37, AR 1295-1296. Regardless, RCI's arguments are wrong. Again, price comparisons is a valid methodology for price realism, *Mil-Mar Cent. Corp.*, 111 Fed. Cl. at 542, and unlike in *DigiFlight*, there was no independent government cost estimate with a higher price that cast doubt on the price comparison method, 165 Fed. Cl. 596. Further, the agency investigated RCI's allegations of affiliation and found them unsupported. *See, e.g.*, Tab 39, AR 1312.

RCI claims that this case is similar to *Active Network, LLC v. United States*, in which the Court found a price realism analysis was not satisfactory where it merely "mention[ed] the price of each offeror in the competitive range . . . listed and organized from lowest price to highest price" but lacked discussion of whether "any of these prices are realistic in relation to the standards discussed in Section M of the RFP." RCI Br. at 28 (citing 130 Fed. Cl. 421, 428 (2017)). DLA's analysis, by contrast, compared the range of unit prices and total evaluated prices for the fuel deliveries and assessed Hawax's price for differential / expenses, concluding

that it was high enough to provide "an adequate margin" above and beyond the fuel costs.  Tab 37, AR 1295-1296.

In the solicitation, DLA did not commit itself to any particular methodology for assessing price realism.  Tab 1, AR 151.  Thus, DLA had discretion to decide "the nature and extent" of its price realism analysis, and its "assessment of potential risk associated with a proposed price." *Mil-Mar Cent.*, 111 Fed. Cl. at 541 (quoting *Afghan Am.*, 90 Fed. Cl. at 357, 358) (cleaned up). DLA was not required to adopt a different approach—such as comparing past offers or assessing offerors' costs—when the prior award was a sole source contract, Tab 9, AR 164, and there was no expectation that offerors would "manage their operations identically or . . . offer prices that include the exact same expenses," Tab 37, AR 1293.[11]

In explaining its approach to price realism to potential offerors, DLA rationally explained its priorities that "[p]rices proposed should be competitive" but that "[i]f proposed prices appear extremely low, then the offeror either doesn't understand the requirement/environment or is low-balling the price."  Tab 9, AR 164.  DLA's approach of comparing offeror's pricing and assessing the reasonableness of Hawax's "differential" was "consistent with the evaluation criteria set forth in the [solicitation]" and otherwise rational.  *See Ala. Aircraft Industries, Inc.-Birmingham*, 586 F.3d at 1375–76 (citation omitted); 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706); *see also Tyler Const. Group v. United States*, 570 F.3d 1329, 1334 (Fed. Cir. 2009) (quoting *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993)) ("Effective contracting demands broad discretion.").

---

[11]  As the contracting officer explained, "[o]ffer prices are expected to vary based on companies' varying efficiencies in managing their operational costs, and, as a result, companies' ability to offer lower versus higher prices."  Tab 37, AR 1293.

3.     RCI's Arguments Regarding The Price Differential Merely Second Guess
DLA's Reasonable Assessment

RCI next argues that "[t]he contracting officer's price realism analysis was irrational

because it included large government-mandated plug numbers."  RCI Br. at 28.  RCI claims that

the agency should not have included the reference price for fuel, but instead focused only on the

differential—which, according to RCI, "was the sole pricing variable that offerors could

manipulate."  RCI Br. at 28.  RCI maintains that including "government-provided plug values in

the price realism analysis was unreasonable because these values overshadowed the contractor-

proposed differentials."  *Id.*

These arguments are unpersuasive.  This is a fuel supply contract and it was not

unreasonable for DLA to consider the price of fuel in assessing the realism of the offerors'

prices.  *See* Tab 37, AR 1293-1296.  The base reference price, which RCI refers to as a

"government-mandated plug number" is merely the reference price utilized to adjust contract

prices under the economic price adjustment clause.  *See, e.g.*, Tab 1, AR 16.  The references

prices are aggregate indexes created by a commercial entity (Platts) to show the average market

price of fuel in a region.  *Id.*  As the contracting officer notes in his analysis "the actual price an

offeror pays for fuel from a given refinery may be more or less than the reference price."  Tab

37, AR 1295.  Accordingly, it would be unrealistic for an offeror to just "plug" in those numbers

as RCI claims. Rather, offerors must consider the base reference price that will be used in

comparison to their own fuel source prices to determine their overall prices and therefore it was

rational for  DLA to consider the total evaluated price.  Even if RCI could show that comparing

the differential prices would be *one* permissible way to assess price realism, RCI Br. at 30, RCI

cannot demonstrate that DLA's approach of comparing the total evaluated price (or the total

evaluated price *and* the differential) is arbitrary or capricious.

4.    The GAO's Analysis Is Instructive

In its advisory opinion, the GAO found that DLA's price realism analysis was "reasonable and consistent with the terms of the RFP." Tab 110, AR 5571. RCI claims that the GAO's analysis erroneously mixed the analysis for price reasonableness with price realism and relied on a DLA table containing errors. RCI Br. at 32-33. As an initial matter, the question in this protest is whether *DLA*'s price realism analysis is rational, and there is no dispute that DLA addressed price realism separately from price reasonableness. *See* Tab 37, AR 1292-1296. In any event, RCI's claims of error in the GAO's analysis are unpersuasive.

As the GAO explained, "[t]he nature and extent of that price realism analysis are within the agency's discretion and the agency is not required to analyze prices on a line-by-line basis or consider every aspect of the offerors' proposed pricing; rather comparison of offeror prices may be used to assess price realism." Tab 110, AR 5571. In determining that DLA's analysis was rational, the GAO found it was "within DLA's discretion" to conduct the price comparison reflected in the price realism memorandum. *Id.* (citing, *e.g.*, Tab 37, AR 1293-1296).

The GAO also reviewed the record and considered that DLA's price reasonableness analysis "compared the lowest offered prices to prices DLA had paid for one-time purchases of the same fuels in recent months." Tab 110, AR 5571 (citing Tab 24, AR 893). RCI argues that the relevant table miscalculated the average prices for the offers from Shanica, RCI, and Hawax, but this argument wrongly assumes that the "average price offered column" averages the three earlier columns in the table. In fact, the "average price offered" column reflects the average based on five data points—Shanica's price for the Syria CLINs, Shanica's price for the Iraq CLINs, RCI's price for the Syria CLINS, RCI's price for the Iraq CLINs, and Hawax's price for the Iraq CLINs. Although this analysis was contained in DLA's price reasonableness

memorandum, it also supports the conclusion that the offered prices were not unrealistically low.[12]

### 5.    RCI's Remaining Arguments Are Unpersuasive

Attempting to combine its price realism arguments with unsupported allegations regarding Iranian fuel, RCI argues that selecting the lowest-priced, technically acceptable offeror created incentives "to cut corners and source cheap Iranian fuel."  RCI Br. at 2.  To the extent RCI claims that Hawax and Shanica must have sourced Iranian fuel because they offered lower prices than RCI, this argument is unpersuasive.

### C.    DLA Rationally Found Hawax And Shanica To Be Responsible

Only responsible contractors may be awarded Government contracts.  *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1361-1362 (Fed. Cir. 2002); FAR 9.103(a).  The contracting officer rationally found that both Shanica and Hawax were responsible, and the GAO stated that it would have denied RCI's protest on this ground.  Tab 38, AR 1297; Tab 39, AR 1305; Tab 110, AR 5572-5573.

In challenging the contracting officer's responsibility evaluation, RCI complains that the contracting officer should have done more than "to simply ask *the suspects*—Shanica and Hawax—whether there was any truth to the accusations."  RCI Br. at 3 (emphasis added).  RCI's arguments reflect a fundamental misunderstanding about the standards for conducting and reviewing a responsibility determination.  Because the contracting officer's responsibility determination is rational, RCI's arguments should be rejected.

---

[12]  RCI also claims that the GAO misunderstood the table by stating it compared the "lowest price" when in fact the table "calculated a composite average," RCI Br. at 33, but regardless of the GAO's characterization, the focus properly remains on *DLA's* analysis, which was rational.

1.    Contracting Officers Have Significant Discretion In Making
Responsibility Determinations

"Contracting officers are 'generally given wide discretion' in making responsibility

determinations and in determining the amount of information that is required to make a

responsibility determination." *Impresa*, 238 F.3d at 1334–35 (quoting *John C. Grimberg Co. v.

United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999)). "[R]esponsibility decisions are largely a

matter of judgment, contracting officers are generally given wide discretion to make this

decision." *John C. Grimberg*, 185 F.3d at 1303 (citing, *e.g.*, *Trilon Educational Corp. v. United

States*, 217 Ct. Cl. 266, 578 F.2d 1356, 1358 (1978)). "[C]ourts may review such decisions by

the contracting officer for an abuse of discretion." *Id.* Mere disagreement with the contracting

officer's weighing of relevant factors does not demonstrate error; so long as the contracting

officer's "decisions have a rational basis and are supported by the record, they will be upheld."

*Bender Shipbuilding & Repair Co.*, 297 F.3d at 1361–62 (citation omitted).

2.    The Contracting Officer Did Not Abuse His Discretion In Finding Shanica
And Hawax Responsible

The contracting officer rationally found that Hawax and Shanica were responsible

prospective contractors. Tab 38, AR 1297; Tab 39, AR 1305 (citing FAR 9.103, 9.104-1). DLA

ensured that neither Hawax nor Shanica was under sanction or restriction by the U.S.

government, Tab 38, AR 1298; Tab 39, AR 1306, and there was "no exclusion or other

derogatory information at sam.gov," Tab 38, AR 1298; Tab 39, AR 1306. Upon review of the

proposals, moreover, the contracting officer found that "a reasonable expectation" that Shanica

and Hawax would "successfully perform the required effort." Tab 38, AR 1298; Tab 39, AR

1306. Further, Shanica's and Hawax's offers obligated them to follow "all U.S. laws applicable

to any performance under a contract." Tab 38, AR 1298; Tab 39, AR 1306.

In reaching the finding of responsibility, the contracting officer also investigated numerous allegations raised by RCI, including assertions that (1) Shanica had links to a company sourcing fuel from Iran, (2) Shanica offered things of value to do business in Syria, (3) Hawax had business ethics and related issues, and (4) Hawax and Shanica made misrepresentations in their proposals. Tab 38, AR 1297; Tab 39, AR 1305. The contracting officer rationally rejected RCI's unsupported allegations. Tab 38, AR 1298-1304; Tab 39, AR 1307-1313.

As the GAO explained, "[t]he record showed that the contracting officer considered [RCI's] notifications, made a reasonable inquiry into them by querying the offerors about matters such as their affiliation, the proposed sources of their fuel, and their resources (drivers, trucks, storage facilities)." Tab 110, AR 5572. "The record also showed that the contracting officer concluded that the awardees' responses were credible and consistent, and that they contradicted the allegations, leaving [RCI's] assertions unsubstantiated. *Id.* (citing Tab 38, AR 1298-1304; Tab 39, AR 1307-1313).

RCI lists a litany of challenges to the responsibility determination, none of which provide any basis for second guessing the contracting officer's reasonable determination. RCI Br. at 44-46.

First, RCI claims that the contracting officer "flipped the burden" requiring an "affirmative" determination of responsibility, by stating that the "similarity among proposals is not a sufficient basis on which to determine Shanica [and Hawax] nonresponsible." RCI Br. at 44 (citing AR, Tab 38 at 1304; Tab 39 at 1312). But the contracting officer did make an affirmative finding of responsibility, finding that Hawax and Shanica were responsible prospective contractors. Tab 38, AR 1297; Tab 39, AR 1305 (citing FAR 9.103, 9.104-1). Further, there is a presumption of regularity for contracting officer's procurement decisions,

*Emery Worldwide*, 264 F.3d at 1085, and a contracting officer "is not required to explain the basis for his responsibility determination." *Konecranes Nuclear Equip. & Services, LLC v. United States*, 165 Fed. Cl. 421, 434–35 (2023) (quoting *Impresa*, 238 F.3d at 1334). Thus, in claiming error based on the wording of the contracting officer's rejection of one of RCI's many unsupported allegations (RCI Br. at 44), it is RCI that attempts to flip the deferential standard for reviewing procurement decisions, *see Impresa*, 238 F.3d at 1332; *John C. Grimberg*, 185 F.3d at 1303.

RCI next claims that DLA failed to "consider whether Shanica and Hawax could comply with the required or proposed delivery or performance schedule" or whether they had a "satisfactory record of integrity and business ethics." RCI Br. at 45 (citing FAR 9.104–1(b), (c)). Again, this is wrong. DLA addressed delivery and performance factors in assessing Shanica's and Hawax's technical acceptability, Tab 24, AR 884-885, and also found a "reasonable expectation" that Shanica and Hawax would "successfully perform the required effort," Tab 38, AR 1298; Tab 39, AR 1306. The contracting officer also rejected RCI's unsupported allegations that Shanica engaged in bribery or had any connection to Asayish instructions not to register in Syria. Tab 38, AR 1299-1301; Tab 39, AR 1306-1307.

RCI also resurrects its unsupported allegations (RCI Br. at 35) that Shanica and Hawax used Iranian fuel and misrepresented their transportation plan—allegations that were soundly rejected by DLA. *See, e.g.*, Tab 38, AR 1299-1303. DLA reviewed Hawax's and Shanica's fuel source data sheets reflecting the sources of fuel and the accompanying certificates of quality, which were "evaluated by a DLA Chemist on the Source Selection Team." Tab 38, AR 1301-1302; Tab 39, 1310-1311. Contrary to RCI's allegation that Shanica was affiliated with an excluded company that sourced fuel from Iran, DLA found that all certificates of quality "were

deemed acceptable for all fuel types," and none of the information in the proposal indicated that the companies were working with any excluded company sourcing fuel from Iran.  Tab 38, AR 1302.  DLA also reviewed Shanica's and Hawax's transportation plans and found they were acceptable.  Tab 24, AR 884-885; Tab 38, AR 1302-1303; Tab 39, AR 1311-1312.  Consistent with DLA's analysis, the GAO stated that "neither proposal supported [RCI's] allegation that the firm would obtain fuel from Iran," nor did RCI show that either Shanica or Hawax "misrepresented its ability to perform with the trucks and other resources in its proposal."  Tab 110, AR 5569.

RCI alleges that "[g]iven the totality of the concerning facts revealed to date," the contracting officer erred in "waiv[ing] away" RCI's allegations of affiliation between Shanica and Hawax.[13]  RCI Br. at 46.  But the contracting officer reasonably investigated RCI's allegations of affiliation, found the evidence insufficient to demonstrate affiliation, and also concluded that even if Shanica and Hawax were affiliated, they would nonetheless remain responsible prospective offerors.  Tab 38, AR 1303; Tab 39, AR 1312.

In assessing responsibility, affiliated concerns "are normally considered separate entities in determining whether the concern that is to perform the contract meets the applicable standards for responsibility."  FAR 9.104-3.  "However, the contracting officer shall consider the affiliate's past performance and integrity when they may adversely affect the prospective contractor's responsibility."  *Id.*  In this case, the contracting officer investigated RCI's allegations—including allegations based on  a hearsay declaration by "█████████████," Tab 30, AR 1055—that Shanica and Hawax were affiliated.  Tab 38, AR 1303; Tab 39, AR 1312.  As the

---

[13]  RCI originally raised allegations of affiliation in the context of allegations of a Procurement Integrity Act violation, Tab 30, AR 1055, which it abandoned before the GAO, Tab 110, AR 5568 n.3, and does not resurrect in this Court.

contracting officer explained, Shanica and Hawax responded to inquiries regarding affiliation by

confirming "that ███████████████████████████." Tab 39, AR 1312; Tab 38, AR 1303.

The contracting officer rationally found "that the information submitted by [RCI] is insufficient"

to draw the conclusion that Shanica and Hawax were affiliated. *See, e.g.*, Tab 39, AR 1312.[14]

RCI nonetheless argues that "[b]oth companies submitted ████████████████████

████████████████, raising serious questions that the companies colluded in

submitting proposals." RCI Br. at 2. Again, however, the contracting officer also investigated

various similarities between the proposals, *see, e.g.*, Tab 39, AR 1309, and found that Hawax had

provided a "reasonable explanation" for any similarities. Tab 39, AR 1312. Specifically, as

Hawax explained, ██████████████████████████████████████

██████████████████████████████████████." Tab 38,

AR 1312. Hawax also explained that it "████████████████████████████████

██████████████████████████████████." Tab 38, AR 1312.

RCI's disagreement with the contracting officer's finding provides no basis for overturning it.

In sum, responsibility determinations are "'largely a matter of judgment." *See Acrow*

*Corp. of Am. v. United States*, 97 Fed. Cl. 161, 170 (2011) (quoting *Bender Shipbuilding &*

*Repair Co.*, 297 F.3d at 1362). The contracting officer in this case rationally exercised his

judgment in finding that Shanica and Hawax were responsible.

---

[14]  Because the contracting officer did not find Hawax and Shanica to be affiliated, he did "not attribute any responsibility information concerning Shanica to Hawax (or vice versa)." Tab 39, AR 1312. Notably, however, "even if they were related," the contracting officer determined Hawax and Shanica to be responsible prospective contractors," explaining that affiliation would not make either offeror nonresponsible. Tab 38, AR 1303; Tab 39, AR 1312.

E.    RCI Provides No Basis For Second Guessing DLA's Corrective Action

RCI raises a string of allegations that it claims DLA should have investigated in greater

detail, *see* RCI Br. at 34-42, but its arguments misunderstand the appropriate standard.

"[I]t is well established that the decision of a government agency whether to conduct an

investigation . . . 'is normally committed to the discretion of the investigative agency.'"

*Confidential Informant 59-05071 v. United States*, 134 Fed. Cl. 698, 717 (2017), *aff'd*, 745 Fed.

Appx. 166 (Fed. Cir. 2018) (unpublished) (quoting *Lewis v. United* States, 70 F.3d 597, 601

(Fed. Cir. 1995)).  Agency enforcement decisions involve "a complicated balancing of a number

of factors which are peculiarly within [the agency's] expertise."  *Id.* (quoting *Heckler v. Chaney*,

470 U.S. 821, 831 (1985)).  Although the bid protest context differs from the agency

enforcement context addressed in *Heckler v. Chaney*, the point remains that the decision of

whether and how much to investigate involves a complicated balancing of factors— including

"whether agency resources are best spent on this violation or another," "whether the particular

enforcement action requested best fits the agency's overall policies, and, indeed, whether the

agency has enough resources to undertake the action at all."  *See Heckler*, 470 U.S. at 831.  Thus,

absent a clear violation of statute or regulation, *Axiom Res. Mgmt.*, 564 F.3d at 1381, courts

should be hesitant to second guess agency determinations regarding whether and how much to

investigate allegations of purported wrongdoing.

RCI nevertheless spends eight pages of its brief detailing a series of complaints with the

scope of DLA's investigation during corrective action, arguing that DLA should have undertaken

additional investigation.  RCI Br. at 34-42.  As support for its claims, RCI cites *Oak Grove*

*Techs., LLC v. United Sates*, 155 Fed. Cl. 84, 102 (2021), *subsequent determination*, 156 Fed. Cl.

594, *appeal filed*, Fed. Cir. No. 22-1557.  But *Oak Grove* is distinguishable.  The decision in *Oak*

47

*Grove* addressed allegations of a conflict of interest prohibited by the FAR 3.101-1—an issue

"so central to the procurement system as a whole that even the mere appearance of impropriety

can be sufficient grounds to disqualify an offeror." *Oak Grove*, 155 Fed. Cl. at 115 (citing *NKF*

*Eng'g, Inc. v. United States*, 805 F.2d 372, 376–77 (Fed. Cir. 1986)).  This case, by contrast,

involves an offeror's unsupported allegations of misconduct by its competitors, absent any

"conviction or a finding by an investigatory entity" of any wrongdoing, Tab 38, AR 1299—

allegations of the sort that incumbents like RCI could be incentivized to raise in nearly every

procurement.

     For example, RCI argues that DLA failed to "adequately investigate" its many

allegations, including (1) "that Shanica and Hawax are closely affiliated," (2) "that Shanica and

Hawax source prohibited Iranian fuel," (3) that Shanica and Hawax "circumvent[ed]

requirements to memorialize fuel source and transit routes," and (4) that Shanica and Hawax lack

the transportation assets needed to perform."  RCI Br. at 35.  But DLA did investigate these

allegations, Tab 38, AR 1298-1304; Tab 39, AR 1307-1313, as correctly recognized by the

GAO, Tab 110, AR 5572.  The fact that RCI wishes DLA had conducted a different investigation

or come to a different conclusion is beside the point.

     RCI also argues that DLA wrongly "disregarded" its February 16, 2024 letter.  RCI Br. at

36-37.  But the February 16, 2024 letter post-dates the decisions that RCI challenges in this case.

After the corrective action and during the GAO protest, RCI submitted another letter to DLA

containing allegations from an unidentified source that Hawax was using Iranian fuel, Tab 60,

AR 1691-1693.  Similar to RCI's previous allegations, the allegations in the letter are premised

on hearsay with no substantiating evidence.  Rather, the letter summarizes an

retelling of a conversation he had with the unnamed source.  In short, the letter does not

demonstrate that DLA's investigation—completed before DLA ever received the February 16, 2024 letter—was irrational.[15]

RCI argues that DLA failed to properly investigate the allegation that Shanica and Hawax were affiliated.  RCI Br. at 37-39.  But the contracting officer engaged in appropriate follow-up with Shanica and Hawax based on RCI's allegations, and found the allegations were unsubstantiated.  *See* Tab 38, AR 1303; Tab 39, AR 1312; *see also* Tab 38, AR 1304 n.2; Tab 39, AR 1313 n.3.  The contracting officer also recognized certain similarities in Hawax's and Shanica's proposals, conducted an investigation, and found that Hawax provided a "reasonable explanation" for the similarities.  AR, Tab 38 1304; Tab 39 at 1312.  Finally, the contracting officer rationally explained that similarity between proposals "does not establish that something improper or illegal occurred."  Tab 39, AR 1312.

RCI nonetheless claims that DLA was required to "further investigate or probe the veracity of the proposal representations" by Shanica and Hawax.  RCI Br. at 40.  But contracting officers are not prohibited from relying on an offeror's representations or certifications.  For example, when assessing a challenge to an offeror's certification, this Court explained that a contracting officer is generally "entitled to rely on a contractor's certifications" and has "no obligation to undertake a fishing expedition to find documents disproving [the protester's] assertion."  *Health Net Fed. Services, LLC v. United States*, 169 Fed. Cl. 738, 775 (2024) (citing *Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1405-06 (Fed. Cir. 2021)).  Similarly, "[w]here an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely on such certification in determining whether to accept a

---

[15] RCI attached the February 16, 2024 letter to its comments on the agency report before the GAO.  *See* Tab 60, AR 1691.

bid." *Allied Tech. Group, Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011).  "[T]he

offeror's potential failure to comply with the proposal requirements is ordinarily 'a matter of

contract administration,' which does not go to the propriety of accepting the bid." *Id.* (quoting

(quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009)).

RCI claims that "the contracting officer's investigation, at best raised more questions

than answers," and should have done more.  RCI Br. at 40.  But this argument conflicts with

precedent showing that agencies have significant discretion in determining the amount of

information required to make a decision.  For example, the Federal Circuit has explained that

contracting officers have wide discretion "in determining the amount of information that is

required to make a responsibility determination." *Impresa*, 238 F.3d at 1334–35 (citing *John C.

Grimberg Co.*, 185 F.3d at 1303).

Notably, because of the agency's obligations pursuant to the Procurement Integrity Act,

the contracting officer could not disclose to Shanica or Hawax the contents of other offerors'

proposals—including certain similarities between the proposals.  41 U.S.C. §§ 2101–2107.  The

Procurement Integrity Act prohibits federal government officials from "knowingly disclos[ing]

contractor bid or proposal information or source selection information before the award of a

Federal agency procurement contract on which the information relates." 41 U.S.C. § 2102(a)(1).

The contracting officer's questions to Hawax and Shanica comply with this provision. *See, e.g.*,

Tab 39, AR 1309.

RCI also argues wrongdoing based on the fact that "[t]he Shanica and Hawax proposals

also included the ████████████████████████████████████████████

████████████████████████████."  RCI Br. at 9, 38.  But it is unclear what

misconduct RCI alleges on this basis, when the commonsense explanation is that offerors asked

refineries for the relevant documentation and the refineries provided it.  In requiring offerors to submit certificates of quality, the solicitation did not require the offerors to conduct an independent analysis separate from the refinery.  Tab 1, AR 149 (requiring "Certificates of Quality and/or Analysis" without further limitation).

Finally, despite claiming that the purported inadequate investigation was "deeply prejudicial," RCI fails to explain how this argument relates to DLA's evaluation of technical acceptability, price realism, or responsibility.  *See* RCI Br. at 42.  RCI cannot demonstrate prejudice based on speculation alone.  On this record, RCI has not met its burden to show that it would have had a "substantial chance" of receiving a contract award had DLA undertaken a different investigation.  *See Bannum, Inc.*, 404 F.3d at 1353.

F.    RCI Fails To Demonstrate Prejudice

To establish prejudice in a post-award challenge, a protester must demonstrate that "but for the alleged error, there was a substantial chance that it would receive an award[.]" *Allied Tech. Grp., Inc.*, 649 F.3d at 1326 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).  As an initial matter, RCI cannot demonstrate prejudice from any of the alleged errors in the award of the contract to Shanica when its challenges to the contract award for CLINs 1-13 are moot.  *See* Section II.

Further, in claiming prejudice from the alleged errors in the award to Hawax for CLINs 15-17, RCI fails to acknowledge that even if Hawax was excluded from the competition, *Shanica* (not RCI) is the next lowest-priced, technically acceptable offeror for CLINs 15-17.  Tab 24, AR 891.  Courts "must consider all the surrounding circumstances in determining whether there was a substantial chance that a protester would have received an award but for a significant error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368

(Fed. Cir. 1999). Thus, RCI does not suffer prejudice from any arguments that could disqualify Hawax, but not Shanica. In such a scenario, RCI cannot demonstrate that it would have a chance, much less a "substantial" chance, of receiving a contract award in this lowest-priced, technically acceptable procurement. *See Precision Asset Mgt. Corp. v. United States*, 125 Fed. Cl. 228, 234 (2016) (finding "no evidence on which to base a finding that plaintiff had not only a chance to receive the award, but a substantial chance").

Finally, to the extent that RCI could succeed on its claims that it was the *only* technically acceptable offeror for CLINs 15-17, we would not dispute that RCI would have a substantial chance of receiving an award in that scenario. As discussed above, however, RCI's allegations of error are meritless.

IV.    RCI Is Not Entitled To The Remedies It Seeks

RCI asks the Court to issue injunctive and declaratory relief, as well as vacatur of the underlying awards. RCI Br. at 48. As discussed above, however, RCI has not demonstrated any significant, prejudicial error in the contract awards and has failed to succeed on the merits of its claims. *See* Section III. Thus, RCI is not entitled to any relief. Even assuming that RCI could demonstrate success on one or more of the errors asserted in its brief, moreover, RCI is not entitled to the requested injunctive or declaratory relief, or the remedy of vacatur.

To demonstrate entitlement to a permanent injunction, RCI must show (1) success on the merits of its case, (2) irreparable harm absent an injunction, (3) that the balance of the harms favors the grant of injunctive relief, and (4) that the requested injunctive relief is in the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004) (*Amoco Prod. Co. v. Vill. of Gambell, Ak.*, 480 U.S. 531, 546 n. 12 (1987)). RCI fails on the first factor, having failed to demonstrate any significant and prejudicial error in the contract awards to Shanica and

Hawax.  Because the "plaintiff does not succeed on the merits of its case, plaintiff is not entitled

to injunctive relief." *See J.E. McAmis, Inc. v. United States*, 164 Fed. Cl. 650, 663 (2023) (citing

*PGBA*, 389 F.3d at 1229).

On the second factor—irreparable harm—RCI claims that it has suffered irreparable

harm from "the lost opportunity to compete fairly for the full scope of the DLA's requirements

under the Solicitation."  RCI Br. at 49 (citing *Seventh Dimension, LLC v. United States*, 160 Fed.

Cl. 1, 34 (2022)).  However, if the Court accepted RCI's argument that "lost opportunity to

compete fairly" qualified as irreparable harm, then every unsuccessful offeror would suffer

irreparable harm.  The Supreme Court has held that such a presumption of injunctive relief is

inappropriate.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *eBay, Inc. v.

MercExchange*, LLC, 547 U.S. 388, 391 (2006).[16]

The balance of the harms and public interest likewise weigh against injunctive relief.  At

the outset of its brief, RCI argues that "[t]his DLA procurement is for the delivery of fuel in

some of the most challenging and unstable regions in the world."  RCI Br. at 1.  That counsels

against RCI's request for an injunction, not in favor of it.  As the contracting officer explained,

DLA is responsible for supplying Department of Defense personnel in the region "with the fuel

required to execute the combatant command's mission."  Rodriguez Decl. ¶ 11.  In satisfying

these needs, DLA must navigate many regional issues to ensure uninterrupted fuel supply.

"Given the current uncertainty regarding contractors' continued access to Erbil and Syria, the

requested injunction would severely limit DLA's ability to adapt to any changes to contractor

---

[16]  In *PGBA, LLC v. United States*, moreover, the Court rejected the claim of irreparable harm to an incumbent from loss of current employees because it "would require this Court to consider any incumbent contractor's loss of a successor contract to be irreparable harm." 60 Fed. Cl. 196, 221 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

access and would pose a significant risk of disruption to the U.S. Government's fuel supply in this critical region." *Id.* ¶ 12. Thus, RCI's interests in increasing its revenue through the award of additional CLINs—in addition to CLIN 14 already awarded to RCI—does not outweigh the Government's weighty interests in ensuring consistent fuel deliveries for Department of Defense operations in Iraq and Syria. Thus, all the equitable factors weigh against issuance of an injunction.

Having failed to demonstrate entitlement to an injunction, RCI also fails to justify its request for declaratory relief. RCI Br. at 48. Indeed, RCI provides no reasoning to support its request for declaratory relief—offering nothing more than a citation to *IAP Worldwide Services* "discussing [the] significance of declaratory relief in bid protests." RCI Br. at 48 (citing *IAP Worldwide Servs. v. United States*, 160 Fed. Cl. 57, 70-71 (2022)). In *IAP Worldwide Services*, however, the Court recognized that when a plaintiff characterizes "its request for equitable relief as one for declaratory relief instead of an injunction," courts will "look[] to the substance of the request." *IAP Worldwide*, 160 Fed. Cl. at 70–72 (citing *PGBA*, 389 F.3d at 1228). When "the practical effect of the two forms of relief will be virtually identical," the "propriety of declaratory and injunctive relief should be judged by essentially the same standards." *Id.* at 72 (quoting *Samuels v. Mackell*, 401 U.S. 66, 72-73 (1971)). RCI fails to delineate the scope of the requested declaratory relief in any manner that could distinguish it from RCI's request for injunctive relief. *See* RCI Br. at 48. Because RCI is not entitled to injunctive relief, it cannot achieve the same end through the different means of a declaratory judgment.

Finally, RCI argues that the Court should vacate the contract awards to Shanica and Hawax, claiming that "the ordinary practice is to vacate arbitrary and capricious agency action." RCI Br. at 48 (citing, *e.g.*, *IAP Worldwide*, 160 Fed. Cl. at 68) (internal quotation marks omitted). But as explained in *IAP Worldwide*, the case cited by RCI, "a remand order that does

vacate an agency's contract award decision *is tantamount to injunctive relief* and certainly requires, at a minimum, a balancing of the relative equities and a finding of irreparable harm sufficient to justify the injunction." *IAP Worldwide Services*, 160 Fed. Cl. at 78–79 (emphasis added). RCI offers no case-specific reason why vacatur would make sense in this case when an injunction is unavailable. Because RCI has failed to establish entitlement to injunctive relief, it cannot seek an injunction through other means, such as vacatur.[17]

<u>**CONCLUSION**</u>

For these reasons, we respectfully request that the Court dismiss-in-part RCI's protest with respect to the award to Shanica for CLINs 1-13, and otherwise deny RCI's motion for judgment on the administrative record.

---

[17] Moreover, although bid protest cases filed pursuant to 28 U.S.C. § 1491(b) incorporate the standard of review from 5 U.S.C. § 706, they do not incorporate the "shall . . . set aside" remedy applicable to cases filed under the APA. *See PGBA*, 389 F.3d at 1225-26. Even in APA cases, "every court of appeals to consider the issue has recognized the power of reviewing courts to remand an agency action without vacatur." *IAP Worldwide Services*, 160 Fed. Cl. at 78 n.38 (quoting *Ackerman Bros. Farms, LLC v. USDA*, 2021 WL 6133910, at *5 (E.D. Mich. Dec. 29, 2021) (citing, *e.g.*, *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001); *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019)).

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Assistant Director

OF COUNSEL

STEVEN SOSKO
Senior Counsel
Defense Logistics Agency Counsel-Energy

RICHARD AVILES
Senior Counsel
Defense Logistics Agency Counsel-Energy

s/Emma E. Bond
EMMA E. BOND
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:     (202) 305-2034
Email:          Emma.E.Bond@usdoj.gov

Dated:  June 7, 2024

Attorneys for Defendant